(No. 65457.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DEMETRIUS HENDERSON, Appellant.

*Opinion filed November 30, 1990.—Rehearing denied April 1, 1991.*

262

266

268

270

272

CLARK, J., joined by CALVO, J., dissenting.

Charles M. Schiedel, Deputy Defender, of Springfield, and Charles W. Hoffman, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund, Renee Goldfarb, Kevin Sweeney and David R. Butzen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendant, Demetrius Henderson, was convicted of the murder of Kim Boyd (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)) following a jury trial in the circuit court of Cook County. On the State's motion, a death penalty hearing was held before the trial judge, defendant having waived his right to a jury at the death penalty hearing. The trial judge found defendant eligible for the death penalty, for he was 18 years old at the time of the murder and had committed · the murder during the course of another felony. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6).) The trial judge also found that no mitigating factors existed sufficient to preclude imposition of the death sentence (Ill. Rev. Stat. 1985, ch. 38, par.

9—1(h)), and so sentenced defendant to death. In addition to the murder conviction, defendant was convicted of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)), for which he was sentenced to 45 years' imprisonment, and aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)), for which he was sentenced to 10 years' imprisonment. Defendant's post-trial motions were denied. Execution was stayed pending direct review by this court. (Ill. Const. 1970, art. VI, §4(b); Ill. Rev. Stat. 1985, ch. 38, par. 9—1(i); 107 Ill. 2d Rules 603, 609(a).) We affirm.

## FACTS

The sexual assault, kidnapping, and murder of 16-year-old Kim Boyd took place during the early morning hours of July 13, 1986. On the night of July 12-13, there was a party at the house of codefendant Curtis Croft attended by defendant, Boyd, codefendants Croft, Kevin Campbell, and Alonzo Woodard, and others, including Anthony Woodard, who testified for the prosecution. There were various comings and goings during that night until around 3 a.m., when Boyd was alone in the house with defendant, Croft, Campbell, and Alonzo and Anthony Woodard. What happened next was revealed by the testimony of Anthony Woodard, by defendant's signed statement given to Assistant State's Attorney Bernard Murray and Chicago police detective Lee Almanza on July 18, 1986, and by the testimony of Dr. Mitre Kalekar, the deputy medical examiner who performed the autopsy on Boyd.

According to defendant's statement, he called Boyd and Anthony into a separate room and angrily asked Boyd why she was having sexual relations with both Anthony and Alonzo Woodard. Boyd made a "smart remark," so defendant picked up a roll of wallpaper and hit her in the head. Defendant then called Croft, Camp-

bell, and Alonzo Woodard into the room, and defendant and those three forced Boyd to engage in a variety of sexual acts. After they were finished, defendant talked to Croft and Campbell about what to do with Boyd. Defendant said they could not just let Boyd go, even though she said she would not say anything, because if he were a girl he would tell what had happened. Instead, defendant said they would have to kill her because he was "not going to spend no time in jail for a bitch." Defendant then went outside to give a friend's car a jump. As he returned to the house, he saw Croft and Campbell indicating he should keep quiet and drive his car to the back of the house. When defendant did so, he saw Boyd standing blindfolded; Croft, Campbell, and Anthony and Alonzo Woodard were present. After Anthony began walking back toward the front of the house, Croft and Campbell put Boyd in the trunk of defendant's car. Campbell said that he, Anthony, and Alonzo would follow, in a second car, defendant's car containing defendant, Croft, and Boyd. Before driving away, defendant stopped and gave another jump to his friend's car. Defendant then intentionally evaded the following car, explaining that he did so because he did not want the others to be present when Curtis and he killed Boyd.

Anthony Woodard's testimony on behalf of the prosecution varied from defendant's statement primarily by denying that his brother Alonzo and Campbell voluntarily participated in the assault. Anthony testified that defendant and Boyd went into a separate room, that defendant then called him into the room, and that he and Croft joined defendant and Boyd. Defendant ordered Boyd to take off her pants, and when she began fighting back defendant hit her twice in the jaw. While Anthony sat in a chair, defendant and Croft forced Boyd to have sexual intercourse. Anthony told defendant and Croft to

stop but did not try to physically stop them because Croft had a knife with a six-inch blade. Anthony could hear his brother Alonzo and Campbell trying to get into the room, but a chair in front of the door prevented them from entering. Later, defendant opened the door and told Alonzo and Campbell to have sex with Boyd; they did so while Croft held a knife on them. Anthony also said that defendant had a knife in his pocket. Defendant then took Boyd into the bathroom, and when they came out Boyd had cleanser on her face. Defendant and Croft tried to confuse Boyd by telling her she was somewhere else. Defendant then said they would have to kill Boyd. While Croft blindfolded Boyd and took her behind the house, defendant went to get his car. Anthony, Alonzo, and Campbell went to the front of the house where they had parked their car, and Anthony saw defendant giving a car a jump. Defendant then drove his car to the back of the house and in a few minutes drove back to the front of the house with Croft in the car. When Campbell asked where Boyd was, Croft patted the trunk of the car. Alonzo offered to take Boyd home, but Croft said he and defendant would do that and tried to ignore the other three. Alonzo, Anthony, and Campbell tried to follow defendant's car in their own car. When they reached the street where defendant should have turned to take Boyd home, Alonzo, who was driving, blew his horn. But defendant continued on and Alonzo soon lost him in traffic.

Through cross-examination, defendant's attorney tried to discredit Anthony's credibility. Anthony testified that he would try to help out his brother and Campbell, who was like a cousin to him, but that he was not related to defendant or Croft. Anthony admitted that he had not tried to physically stop the assault, but had merely asked defendant and Croft to stop. Nor did he try to escape from the room and get help, even though

at certain times, when Croft was with Boyd, he only would have had to get by defendant, whose knife was in his back pocket and who was smaller, although older, than Anthony. Furthermore, Anthony never approached the police to tell them what had happened, waiting until they came to him.

We have only defendant's statement, and the forensic evidence, to tell us what happened after defendant eluded the other car. Both defendant and Croft expressed some hesitancy about killing Boyd, but in the end decided that they had to do it. Defendant stopped the car in an alley behind the 6000 block of South Carpenter Street in Chicago, and opened the car's trunk, and he and Croft took Boyd out. She told defendant she could "explain," but defendant grabbed a switchblade knife Croft was holding and stabbed her twice in the throat. Croft then took the knife and stabbed Boyd, then defendant did so, and they alternated in this way until Boyd had approximately 40 stab wounds in her head, neck, chest, hands, back, and buttocks. Believing she was not yet dead, defendant and Croft got into the car and defendant drove over her three times. They got out of the car, confirmed that she was finally dead, and drove away. Dr. Kalekar testified concerning the multiple stab wounds, bruises, broken bones, and other wounds to the body consistent with being run over and dragged by a car.

Boyd's body was found later that morning and a police investigation was begun, leading to the arrest of defendant and Curtis Croft on July 17, 1986, at defendant's home. At the Area 3 Violent Crimes police station during the night of July 17-18, Assistant State's Attorney Murray and various detectives questioned defendant, Croft, Campbell, Anthony and Alonzo Woodard, and two girls who had attended the party the night of July 12-13. Initially, defendant denied involvement in the murder, al-

though he admitted being at the party. When Assistant State's Attorney Murray told defendant this was inconsistent with what other witnesses had said, defendant asked what Croft had said. Croft was brought into the room and recounted the statement he had made to the police earlier. Defendant then made both an oral and a court-reported statement.

Defendant's jury trial was severed from the bench trials of his codefendants; however, all four trials were conducted simultaneously. Additional facts concerning the night of July 12-13, the course of the police investigation, and the conduct of the trial will be related as necessary.

## ANALYSIS

Defendant presents numerous arguments for our consideration and requests that we grant him a new trial, or, in the alternative, that we vacate his death sentence and remand for a new death penalty hearing or imposition of a sentence other than death. Defendant's arguments concern the selection of the jury, the admission and exclusion of evidence at trial, the conduct of the sentencing hearing, the propriety of his sentences of death and imprisonment, and other matters.

### Jury Selection

Defendant first challenges his convictions on the basis that, in selecting the jury which convicted him, the prosecution purposefully discriminated against black venire members when exercising peremptory challenges, and thus violated the equal protection clause of the fourteenth amendment (U.S. Const., amend. XIV), as construed in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. The Supreme Court in *Batson* held that the prosecution denies a defendant his

rights under the equal protection clause if the prosecution exercises peremptory challenges so as to purposefully exclude members of a defendant's race from the jury. In order to establish a *Batson* claim, a defendant has to first establish a *prima facie* case by showing that he is a member of a cognizable racial group and that the prosecution exercised peremptory challenges to exclude from the jury venire members who share his race, and by pointing to any other relevant circumstances that raise an inference of purposeful discrimination by the prosecution. (See *People v. Hope* (1990), 137 Ill. 2d 430, 452-56 (discussing the process used in adjudicating a *Batson* claim).) In this case, the issue is whether the trial court erred in ruling that defendant had not established a *prima facie* case.

After a jury of 12 and 2 alternate jurors had been sworn, but before opening statements had been made, defense counsel moved for a mistrial on the basis that the prosecution had systematically excluded black venire members from the jury through the exercise of peremptory challenges. Defense counsel noted that of the nine venire members peremptorily challenged by the prosecution, six were black (appellate defense counsel acknowledges that the prosecution actually used ten, not nine, peremptory challenges). Defense counsel further noted that the jury chosen consisted of four white males, six white females (two of whom were apparently Hispanic), and two black females. The two alternate jurors were a black male and a white female. To buttress his motion, defense counsel also referred to the prosecution's exercise of peremptory challenges during the aborted *voir dire* of the first venire called in this case: Of the three peremptory challenges exercised by the prosecution during *voir dire* of this first venire, two were exercised against blacks. (*Voir dire* of the first venire proceeded only as far as the selection of a panel of four jurors, at

which time the entire venire and the four jurors chosen from it were dismissed by the trial judge because the judge, without objection from counsel, excused one of the four chosen jurors, the only black on that panel, after finding that the juror would not be able to fully concentrate on the case, and because the defense refused to accept the broken panel of jurors.) In framing his *Batson* claim on appeal, defendant has also included those three peremptory challenges exercised by the prosecution during *voir dire* of the first venire. The trial court reserved ruling on defendant's motion for a mistrial until the morning of the next day.

At that time one juror, apparently one of the two Hispanic females, who had told the trial judge that she would be unable to concentrate on the trial owing to serious personal problems, was brought into chambers to repeat her concerns in the presence of the lawyers. The judge excused this juror without objection. The first alternate, a black male, then became a juror.

The judge then denied defendant's motion for a mistrial, finding that the prosecution had not systematically excluded blacks from the jury and therefore would not have to explain the reasons for its challenges, and thereby implicitly finding that defendant had not made a *prima facie* case of purposeful discrimination as required by *Batson*. In announcing its ruling, the court documented the jury selection procedure that had been used, the racial makeup of the jury, and the peremptory challenges used by the prosecution.

Because the record is unclear as to certain facts, in evaluating defendant's claim of purposeful discrimination, we have had to make our own review of the record to determine the number of challenges exercised by the parties and the races of those challenged by the prosecution. We have found the following pertinent facts, construing any ambiguity in the record against defendant,

who had the burden of preserving the record (see, *e.g.,* *People v. Brown* (1987), 152 Ill. App. 3d 996, 1002).

The jury selection procedure used was to seat panels of venire members (three panels were seated, numbering 14, 14, and 12), have the trial judge inquire of them initially, and then allow inquiry first by the defense and then by the prosecution as to the first panel, and first by the prosecution and then by the defense as to the second and third panels. Following the questioning of each panel, the defense and the prosecution gave the trial judge a list of those venire members whom they challenged, without revealing these challenges to the opposition. This procedure was used on the recommendation of defense counsel.

Of the 40 venire members examined, 3 were excused for cause. Prosecution and defense were each allotted 14 peremptory challenges; the prosecution used 10, while the defense used 13. Of the 10 peremptory challenges exercised by the prosecution, 6 were exercised against blacks. Of the 27 venire members accepted by the prosecution, 5 were black. After the defense exercised its challenges, 3 of the 14 venire members chosen to serve as jurors or alternates, and 3 of the 12 jurors who convicted defendant (the black alternate became a juror after the first day of testimony), were black. The relevant racial statistics are thus: 30% of the pool of 37 venire members not challenged for cause was black, compared to black representation of 19% among the 27 venire members accepted by the prosecution; also, 60% of the State's 10 peremptory challenges were exercised against the black 30% of the venire, and 21% of the 14-member jury was black.

In determining whether the trial judge correctly ruled that defendant failed to establish a *prima facie* case of purposeful discrimination, we constrain our inquiry in certain ways: We consider the *voir dire* of the second

venire only; we disregard any racial distinction between Hispanic and white venire members; and we consider the jury as a group of 14 which includes the 2 alternates selected, not as a jury of 12.

Contrary to defendant's urgings, we decline to consider the prosecution's peremptory challenges to members of the first venire, before that venire was dismissed. As stated, a panel of four jurors was initially selected from the first venire, and in selecting this panel the prosecution exercised three peremptory challenges, two of which were against blacks. We decline to consider these challenges because we recognize that attorneys approach the selection of a jury as one entire process, during which an attorney individually assesses each venire member's character, views, and impartiality, and then decides which venire members to challenge and which to accept while reserving a sufficient number of challenges for use against those venire members who have not yet been questioned. Given the complex strategic nature of the jury selection process and the exercise of peremptory challenges, we find that the facts involved in the selection of a single panel of four jurors are not probative of whether the prosecution purposefully discriminated in the selection of a full jury. For the same reason, we reject the State's approach of analyzing the racial balance of the prosecution's challenges by separately analyzing its challenges to each of the three panels of venire members seated from the second venire, as well as its challenges as a whole.

We disregard the racial distinction between Hispanic and white venire members accepted by the prosecution, a distinction which the trial judge apparently relied on in part, for he mentioned the presence of two Hispanics on the jury, making a total of "five minority people." Because defendant is black, the only relevant racial distinctions among venire members in this case are black and

nonblack. In establishing a *prima facie* case of prosecutorial discrimination against venire members of a defendant's race, a defendant can only rely on the prosecution's exercise of "peremptory challenges to remove from the venire members of the defendant's race" (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723; see *People v. Holman* (1989), 132 Ill. 2d 128, 171 (trial court correctly refused to consider prosecution's challenges to one Hispanic and one Filipino venire member, for defendant was black)). By the same token, we find that, in determining whether a *prima facie* case is established, it is irrelevant whether the prosecution accepted some venire members who belonged to a racial minority other than that of defendant.

Because of the method of jury selection used in this case, we include in our review not only the 12 original jurors, but also the 2 alternate jurors. The jury was selected from three panels of venire members, numbering 14, 14, and 12. By the time the third panel was called, 10 jurors had been selected. Thus, when the final panel of 12 was questioned, 2 jurors and 2 alternates were needed. Once again, the prosecution and the defense simultaneously submitted to the trial judge their challenges. The result was that 8 of these 12 venire members were challenged and 4, the exact number of jurors needed, were accepted. Of the four accepted, the first two who had been called became jurors, while the other two became the first and second alternates. Given this procedure of selecting the alternates from the same venire panel as the jurors, not from a separate panel, and given the fact that it was impossible for the prosecution to know, at the time it exercised its challenges, that the black male venire member whom it accepted would not initially be seated as a juror, we find the races of the two alternate jurors to be relevant in deciding defendant's claim. (The black male, Juror M, was the fifth

venire member called; the defense had three peremptory challenges remaining and the prosecution had eight; if the prosecution had wanted to minimize the likelihood of Juror M's becoming a juror, as opposed to an alternate juror, yet had been hesitant to strike him, it would not have challenged any of the four venire members who preceded Juror M, hoping the defense would not use all three of its challenges against three of the first four venire members; but in fact the prosecution challenged the third venire member, a white female.)

With this understanding of the factual boundaries of our review, we consider the arguments of the parties. The first decision we must make is whether defendant is able to present a *Batson* claim to us, for the State asserts that this claim was waived because defendant's objection to the prosecution's use of peremptory challenges was untimely. The State is correct; defendant waived his *Batson* claim by voicing his objection and moving for a mistrial in an untimely manner, not doing so until after the jury had been sworn. (*People v. Andrews* (1989), 132 Ill. 2d 451, 457; *People v. Harris* (1989), 129 Ill. 2d 123, 170-71.) Nonetheless, we consider defendant's *Batson* claim because, for its part, the State's right to raise defendant's waiver was itself waived when the prosecution neglected to argue the untimeliness of defendant's motion at the time the motion was made, and instead attacked the motion's merits. *Andrews*, 132 Ill. 2d at 458; see also *Harris*, 129 Ill. 2d at 171 (prosecution waived argument that defendant's claim of prosecutorial discrimination against black venire members was waived when untimely made because it did not raise waiver argument until after *Batson* hearing had been held).

On the merits of his claim, defendant contends that the numerical racial imbalance of the prosecution's peremptory challenges, 6 of 10 being exercised against blacks, alone raises an inference of purposeful discrimi-

nation and establishes a *prima facie* case. Defendant cites cases in which the appellate court found a *prima facie* case established by similar numbers. (See, *e.g.*, *People v. Seals* (1987), 153 Ill. App. 3d 417 (*prima facie* case established where prosecution used 6 of 10 challenges against blacks without any apparent nonracial reason).) Besides the black-nonblack ratio of prosecution challenges, defendant argues that the following facts create an inference of purposeful discrimination: The prosecution struck all six blacks without asking them any questions probative of their backgrounds or impartiality, striking two of the six without asking them any questions, and striking the other four after asking such general questions as whether they could give the State a fair trial; the challenged blacks were heterogeneous in all respects except race; the only respect in which the challenged blacks could be distinguished from the white jurors was by race; and defendants in Cook County frequently claim that the prosecution systematically excluded blacks from their juries. Defendant discounts the relevancy of the fact that three blacks served on his jury, arguing that the issue is whether the prosecution discriminated against any of the six blacks it struck, not whether it failed to discriminate against the three black jurors.

Responding to defendant's arguments, the State reminds us that a *prima facie* case of purposeful discrimination cannot be established merely by the number of blacks stricken by the prosecution (see, *e.g.*, *People v. Hooper* (1989), 133 Ill. 2d 469, 505), and mentions other factors which this court has found relevant in ruling on a *Batson* claim. Also, the State makes the odd assertion that when each panel of venire members is examined individually it becomes apparent that "the prosecution exercised practically the same number of peremptory challenges to remove whites as blacks"; we have already

rejected the method of analyzing *Batson* claims by fragmenting the jury selection process. Next, the State points out that the prosecution accepted at least one black from each panel and argues that this shows the prosecution did not exclude as many blacks as it could have done, a relevant factor (see, *e.g., United States v. Montgomery* (8th Cir. 1987), 819 F.2d 847, 851). In addition, the State believes that any inference of discrimination is undercut by the fact that 25% of the jurors, 3 of 12, were black, about the same as the percentage of the Cook County population 18 years old and older.

The State also contends that more than race distinguishes the stricken black venire members from white venire members accepted by the prosecution. Whereas many of the accepted white venire members were crime victims, one had a friend who had been raped, one had been a parole officer, one was training to be a policeman, and others knew lawyers and police officers, five of the six stricken black venire members did not share these characteristics. The State also claims that several of the stricken blacks had characteristics which the prosecution may have considered to be unfavorable; we find the factual support for this latter claim to be extremely weak. Additionally, the State claims the stricken blacks were similar in respects other than race, yet supports this claim merely by stating that most of them (in reality only three of six) lived alone and were single. The State also notes that the record does not evidence the age of each venire member, a possibly legitimate distinguishing factor. The State denies that the number of times defendants in Cook County have claimed prosecutorial discrimination during jury selection is relevant; while the number of such claims proved might be relevant, defendant did not provide that information. On the other hand, one relevant fact in this case is that the victim and most of the witnesses are black, as is defendant, tending to

negate a discriminatory motive by the prosecution. (See *People v. Evans* (1988), 125 Ill. 2d 50, 66 (racial characteristics of crime are relevant when ruling on establishment of *prima facie* case).) As a final point, the State mentions this court's previous holding that a trial court's finding that a defendant has not established a *prima facie Batson* claim will be overturned only if against the manifest weight of the evidence (*People v. Brisbon* (1989), 129 Ill. 2d 200, 231), and the Supreme Court's comment in *Batson* that a reviewing court should give "great deference" to a trial court's finding on intentional discrimination because it largely depends on an assessment of credibility (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21).

Defendant responds to these arguments by asserting that, though the State claims that one possible reason for the prosecution's striking five of the six excluded black venire members is that they lacked characteristics the prosecution might have seen as favorable, some of the accepted nonblack jurors likewise lacked these characteristics (significantly, defendant limits his argument only to nonblack jurors, excluding from his analysis those nonblack venire members accepted by the prosecution but stricken by defendant); the State fails to provide credible facts to support its argument that any stricken black venire members had characteristics unfavorable to the prosecution; and the characteristics of being single and living alone, cited by the State as a nonracial difference between the stricken blacks and the accepted nonblacks, not only were not possessed by three of the stricken blacks, but in fact were possessed by two white jurors. Defendant disputes that the fact that defendant, the victim, and many witnesses were black militates against the prosecution's possessing a discriminatory motive. For one thing, discrimination is illogical—if the prosecution was " 'of a mind to discriminate' " (*Batson*,

476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723, quoting *Avery v. Georgia* (1953), 345 U.S. 559, 562, 97 L. Ed. 1244, 1248, 73 S. Ct. 891, 892), it may have concluded that black jurors would be less likely to convict a black defendant even if the murder victim was also black. Furthermore, defendant thinks the two most crucial prosecution witnesses were a white policeman and a white assistant State's Attorney, both of whom testified to defendant's questioning on the night of July 17, 1986, when he confessed. Defendant also denies that the trial court's finding of no *prima facie* case should be given any deference by us, for the quotation the State took from *Batson* regarding the deference to be given to a trial court's ruling referred to a trial judge's analysis of neutral explanations offered by the prosecutor, at which time a trial judge assesses the prosecutor's credibility (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21).

The standard of review we apply, in determining whether the trial judge erred in ruling that defendant had failed to establish a *prima facie* case of purposeful prosecutorial discrimination against black venire members, is whether this ruling is against the manifest weight of the evidence. (*Brisbon*, 129 Ill. 2d at 231; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 413.) In making this determination, because defendant has first shown he is a member of a cognizable racial group and members of the same racial group were peremptorily challenged by the prosecution (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723 (first element of a *prima facie* case)), we will consider all facts which reasonably indicate or refute purposeful discrimination by the prosecution, not just the number of challenges exercised against black venire members (see *Hooper*, 133 Ill. 2d at 505; *People v. Holman* (1989), 132 Ill. 2d 128, 172). Other factors from which an inference of discrimination can be

drawn are: a disproportionate number of strikes against blacks, especially when so disproportionate as to present a "pattern" (see, *e.g., Hope*, 137 Ill. 2d at 462-63; *Mahaffey*, 128 Ill. 2d at 413); the level of black representation on the jury as compared to the venire (*Hooper*, 133 Ill. 2d at 503; *Mahaffey*, 128 Ill. 2d at 413); whether the stricken black venire members are heterogeneous in every respect except race (*e.g., Hooper*, 133 Ill. 2d at 503; *Mahaffey*, 128 Ill. 2d at 413); the prosecutor's questions during *voir dire* and statements when exercising challenges (*Hooper*, 133 Ill. 2d at 503; *Holman*, 132 Ill. 2d at 172-73); and the race of the defendant, victim, and witnesses (*e.g., Hope*, 137 Ill. 2d at 453; *Holman*, 132 Ill. 2d at 172-73).

Viewing all the relevant facts of this case, we cannot say that the trial court's finding that defendant failed to establish a *prima facie* case is against the manifest weight of the evidence. The only factor strongly suggesting purposeful discrimination is the disproportionality of the prosecution's challenges to black as opposed to non-black venire members; 6 of the prosecution's 10 peremptory challenges, or 60%, were used against blacks, who constituted only 30% of the venire members not excused for cause. Yet this disproportionality is not so severe that it creates a "pattern." All other relevant factors tend to refute the idea of discrimination, weigh neutrally in the balance, or mildly tend to suggest discrimination.

A factor that tends to refute an inference of discrimination, or whose value is, at most, neutral, is that this black defendant was found guilty of raping and murdering a young black woman. Despite defendant's view that the illogical nature of discrimination makes a crime's racial character irrelevant, we have to employ logic in our analysis; thus, we find that, when deducing the existence of a *prima facie* case of purposeful discrimination, whether or not the defendant and the defendant's victim

are members of the same cognizable racial group is a relevant factor (see, e.g., Hope, 137 Ill. 2d at 453). In a case where the defendant is black and the victim is white, we recognize, at the prima facie stage of establishing a Batson claim, that there is a real possibility that the prosecution, in its efforts to procure a conviction, will use its challenges to secure as many white jurors as possible in order to enlist any racial fears or hatred those white jurors might possess. On the other hand, in a case where both the defendant and victim are black, their racial characteristics do not warrant an inference, at the prima facie stage, that the prosecution discriminated against venire members who were black. Furthermore, we refuse to conclude that the fact that the defendant is black supports an inference of prosecutorial discrimination regardless of the victim's race.

Nor do we infer a discriminatory motive by the prosecution from the fact that the assistant State's Attorney who elicited defendant's confession and the police officer who testified to the course of the murder investigation were white. In fact, we believe the "star" prosecution witness was Anthony Woodard, the black youth who provided the only evidence, other than defendant's confession, that defendant sexually assaulted Boyd and drove off with her in the trunk of his car in the early morning hours of July 13, 1986.

In this case, the heterogeneity of the stricken black venire members is a neutral factor. Our review of the record shows that five of the six were nondiverse in respects other than race. Five of the six were single and had a college education; three of these five lived alone, and the other two lived with immediate family. The sixth stricken black venire member was separated from her husband, had three daughters ranging in age from 22 to 30, apparently lived alone, and was unemployed, as were two of her three daughters. While these six venire mem-

bers did not share identical backgrounds, and while it is true that the prosecution accepted white venire members who were single and lived alone, at this stage of a *Batson* claim we are only concerned with whether the stricken black venire members shared any characteristics other than race; it is not our role to search for possible reasons for the prosecution's strikes or for similarities between stricken black and accepted white venire members.

Another neutral factor here is the number and nature of the questions the prosecutor asked stricken black venire members and the statements the prosecutor made when exercising challenges. True, the prosecutor failed to ask any probative questions about the stricken black venire members' backgrounds or personalities; but, the fact is, the prosecutor failed to ask such probative questions of any venire members, black, white, or Hispanic. With one exception, the prosecutor limited his questions to general "fair trial" kinds of questions; the one exception was the prosecutor's asking a female black venire member, whom the prosecution accepted and who became a juror, about an attack on her husband and his crippling on-the-job injury. When exercising its challenges, the prosecution made no statements.

The final relevant factor is the level of black representation on the jury as compared to the venire, and here there is some support for an inference of discrimination. Of the 37 people not excused for cause, 11 were black, or 30%; of the 14-member jury there were 3 blacks, or 21%; and of the 27 venire members accepted by the prosecution, 5 were black, or 19%. Thus, there was a slight disparity between the level of black representation on the venire, 30%, and that on the jury, 21%.

In sum, considering all the relevant factors, only two factors (the percentage of blacks on the venire not excused for cause compared to the percentage of the pros-

ecution's peremptory challenges exercised against and as compared to the percentage of blacks on the jury) tend slightly to suggest purposeful discrimination, while the others are either neutral or tend to refute such a suggestion. Therefore, we cannot say the trial court's finding that defendant failed to establish a *prima facie* case of purposeful discrimination by the prosecution's exercise of peremptory challenges is against the manifest weight of the evidence.

Defendant's second claim of reversible error during jury selection is that the trial judge questioned two sworn jurors and one prospective juror, then excused all three for cause, without defendant's being present (defense and prosecution counsel and a court reporter were present). This claim is controlled by our recent decision of *People v. Bean* (1990), 137 Ill. 2d 65, 78-89. The legal arguments defendant presents here are virtually identical to those presented by the defendant in *Bean*: Defendant had a constitutional right to be personally present at the questioning of these jurors in chambers, his attorney had no power to waive this right, and the trial court committed reversible error by denying him this right. In *Bean*, we held that although criminal defendants have a broad right to be present at every stage of trial, including throughout jury selection, under either the Illinois or the United States Constitution unconstitutional violations of this right requiring reversal of a conviction and remand for a new trial occur only when as a consequence a defendant is deprived of a fair and just trial, such as when a defendant is tried by a prejudiced jury. If the jury which tried a defendant appears to have been impartial, the defendant's constitutional rights were not violated even though he was absent from the in-chambers *voir dire* of one or more venire members, for both the Illinois and the United States Constitutions guarantee defendants a jury that is impartial, not a jury of

their choice. Even though the facts in this case differ from those in *Bean*, our holding in *Bean* is applicable. We will, however, briefly review these facts.

All three of these jurors were excused for cause by the trial judge. The two sworn jurors were both excused because aspects of their personal life caused them to doubt that they could concentrate on the evidence presented at trial and fulfill their duties as jurors. The trial judge asked both defense and prosecution counsel if they wished to question either of these jurors; they did not. He then asked if there was any objection to excusing these jurors for cause; there was not. Concerning the prospective juror excused for cause, she had already submitted to questioning by the trial judge and defense and prosecution counsel when the bailiff informed the trial judge this woman had been convicted for unlawful use of weapons, a conviction she had never mentioned (though asked if she had ever been the accused in a criminal case) or written on her juror information card. After questioning her in chambers, the judge excused her for cause, finding that her failure to disclose the conviction, after taking an oath as a venire member to tell the truth, indicated she would not properly do her duty as a juror; defense counsel objected, believing this woman had simply made a mistake.

On these facts, we find that defendant's absence from this in-chambers questioning did not deprive him of an impartial jury, and so does not warrant reversal of his conviction. Each of these three jurors was excused for cause by the trial judge; as the time for the parties to exercise peremptory challenges and challenges for cause had passed, the utmost that defendant could have done if present would have been to register his own objections to these excusals. Yet, as the decision whether to excuse a juror is within a trial judge's discretion (*People v. Cole* (1973), 54 Ill. 2d 401, 414), and the trial judge in this

case clearly acted within his discretion, we cannot conclude that defendant's presence would have had any real effect. More importantly, as we found in *Bean*, the record does not indicate that the jurors who served in the place of the three people who were excused were prejudiced against defendant. There was no reversible error.

## Legality of the Warrantless Arrest

According to defendant, the trial court erred when it denied his pretrial motion to quash his warrantless arrest and to suppress his oral and written statements admitting his part in the sexual assault and murder of Boyd, which he made after being arrested. In denying this motion, the trial court found both that defendant's mother consented to the police entry into her home and that exigent circumstances justified the police's failure to procure an arrest warrant. We will not reverse the trial court's denial of defendant's motion to quash and suppress unless it was clearly erroneous. *People v. White* (1987), 117 Ill. 2d 194, 209; *People v. Clark* (1982), 92 Ill. 2d 96, 99.

At the hearing held on this issue, two police officers who participated in the arrest testified, as did defendant's mother. The account given by the officers of how the police gained entry to the apartment that defendant and his mother shared differed from the account given by defendant's mother.

Detectives Almanza and Tuider described the events of July 17, 1986, as follows. Almanza and other police officers talked to Alonzo Woodard at Area 3 headquarters. Alonzo said he had been at the party on the night of July 12-13 when defendant and Curtis Croft brought Boyd into a separate room; Alonzo later heard Boyd screaming; when Alonzo tried to enter the room, defendant angrily told him to get out. Almanza, Tuider, three other detectives, and Alonzo Woodard drove to defend-

ant's apartment in two unmarked squad cars; a marked squad car with two uniformed police officers was also present. None of the officers had an arrest warrant. At approximately 5:30 p.m., Almanza and Tuider knocked on the front door of defendant's apartment; there was no response, so they returned to their car. At approximately 6:25 p.m., a car which Alonzo identified as defendant's was driven into the parking lot. Almanza and Tuider walked to the car and asked the driver his name; it was Croft. Croft was arrested and was read his *Miranda* rights. Tuider talked to Croft. Croft said he knew the police were there because of the girl's murder, but he did not "do it," defendant did. Croft also said that defendant was in his apartment, waiting for Croft. On hearing this, Almanza, Tuider, a third detective, and a uniformed officer returned to the apartment. While Tuider and the uniformed officer watched one exit, Almanza and the other detective knocked on the front door. Defendant's mother opened the door. Almanza identified himself as a police officer and asked if defendant was home, to which defendant's mother answered "yes"; according to Almanza, she then stepped back and pointed toward a bedroom. Almanza thanked her and he and the other detective walked into the bedroom, saw defendant, and arrested him. At this point, there were only two officers in the apartment and neither had drawn his gun. A few minutes later, Tuider and one or two uniformed officers entered. Defendant was handcuffed and taken to Area 3 headquarters.

Defendant's mother told a different version. She testified that on opening the door she saw five or six police officers with guns in their hands (on cross-examination she said she remembered seeing only two guns). These officers "just rushed in and asked me was Demetrius Henderson there"; when the officers asked this, they were in her home without first having asked her permis-

sion to enter. She said defendant was in his bedroom. The officers entered the bedroom, arrested defendant, and handcuffed him. On cross-examination, defendant's mother said she had not heard the police knocking on the door at 5:30 p.m., although she had been home. Inconsistencies in her testimony were also revealed.

The trial court found that the police officers had had probable cause to arrest defendant, that they had received consent to enter the apartment from defendant's mother, and that exigent circumstances had existed to validate the warrantless arrest. In finding consent, the court first found the testimony of the officers to be more credible than that of defendant's mother. The court then found that defendant's mother consented to the entry by telling the two officers, who used no force and had their guns holstered, that defendant was home and "by stepping back from the door and pointing to the bedroom." The court gave weight to the fact that defendant's mother "did not say to them, do not come in. She did not say to them any words to indicate to the police that they should not enter."

Defendant appeals this ruling, asserting that even if the officers' version is accepted, the actions of defendant's mother in stepping back from the open front door and pointing to a bedroom cannot be considered consent to the police's entering her apartment. Rather, her actions were a mere acknowledgment that defendant was home. Furthermore, as support for its ruling, the trial court erroneously relied on the failure of defendant's mother to object to the police's entry for a failure to object cannot be equated with consent to enter. Defendant cites a Federal appellate case holding that consent to enter must be " 'unequivocal and specific.' " (*United States v. Gay* (10th Cir. 1985), 774 F.2d 368, 376 (search of automobile), quoting *United States v. Recalde* (10th Cir. 1985), 761 F.2d 1448, 1453.) In defendant's

opinion, because the officers never asked permission to enter the apartment of defendant's mother, she could not have consented to a request that was never made. Protecting the sanctity of the home demands "more to overcome the warrant requirement than an ambiguous gesture made in response to an inquiry that concededly did not even constitute a request to enter." For these reasons, defendant believes the prosecution failed to prove that there was valid consent (see *People v. White* (1987), 117 Ill. 2d 194, 221).

Defendant's argument suggests that the unequivocal and specific consent that is necessary can only exist if the police expressly ask to enter and are verbally answered in the affirmative; conduct or body language of an occupant of a home is insufficient. Defendant relies on two factually similar cases in which consent to enter was found not to have been given. Our appellate court, in *People v. Johnson* (1981), 99 Ill. App. 3d 863, held that the trial court did not err when it found that the police had not been given consent to enter defendant's home, and so granted defendant's motion to quash his arrest and suppress evidence. In response to the knock of two police officers, defendant's grandmother opened the main front door but left the screen door closed; the officers identified themselves and, seeing the suspect they were looking for on the stairs inside the house, one officer told defendant's grandmother they wanted to arrest him; at that, she opened the screen door; the officers entered and arrested defendant. When defendant's grandmother opened the screen door she did not orally invite the officers to enter, nor did she tell them not to enter. The appellate court held that, because the police never asked permission to enter the home and because there was no evidence of the grandmother's subjective state of mind, which is necessary to determine the voluntariness of consent, her conduct in merely opening the

door in response to the officer's statement that they wanted to arrest the man they saw was not voluntary consent but merely " 'acquiescence to a claim of lawful authority,' " which the Supreme Court found to be insufficient in *Bumper v. North Carolina* (1968), 391 U.S. 543, 548-49, 20 L. Ed. 2d 797, 802, 88 S. Ct. 1788, 1792. (*Johnson*, 99 Ill. App. 3d at 865.) Defendant also relies on a case from the Colorado Court of Appeals, holding that a trial court erred in finding that "passive consent" to a police entry was given by the defendant's mother when she did not object when officers pushed past her and entered her home; a mere failure to object to police entry into one's home is not clear affirmative evidence of consent. *People v. Santisteven* (Colo. App. 1984), 693 P.2d 1008.

In response, the State contends that the conduct of defendant's mother, in the absence of any show of force by the police, constituted voluntary consent, and that the trial court's finding of consent was largely a finding of fact and so is not to be reversed unless against the manifest weight of the evidence (*People v. Clark* (1982), 92 Ill. 2d 96, 99 (reverse ruling on a motion to suppress only if clearly unreasonable)). The State also distinguishes the two cases upon which defendant relies. *Johnson* was simply decided wrongly, for by opening the screen door defendant's grandmother gave her consent. Moreover, whereas *Johnson* was in part decided on the grounds that there was no evidence of the grandmother's state of mind, in the present case defendant's mother did testify, testimony to which the trial court gave little weight. *Santisteven* is easily distinguishable by the lack of any evidence of affirmative conduct in that case, there being only evidence of a failure to object.

We find that the trial court's determination that defendant's mother consented to the police entry was

not clearly erroneous (and therefore do not address the other ground for the trial court's denial of defendant's motion—the existence of exigent circumstances). Defendant's inculpating statements to the police were admissible.

The fourth amendment (U.S. Const., amend. IV) bars warrantless and nonconsensual arrests in the home, absent exigent circumstances. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.) Yet, what words or conduct constitute consent to enter a home has never been explicated by the Supreme Court. (But see *Bumper*, 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (defendant's grandmother's allowing police to enter after they falsely claimed to have a search warrant was not voluntary consent, but the product of coercion).) Although the lower courts generally agree that consent to enter a residence validates a warrantless arrest (2 W. LaFave, Search & Seizure §6.1(c), at 582 (2d ed. 1987) (and cases cited)), there is little authority as to what constitutes consent in the absence of an express verbal statement. But see *United States v. Briley* (8th Cir. 1984), 726 F.2d 1301 (valid consent was given when defendant's girlfriend told police officers defendant was in her apartment and they should come with her, and girlfriend then opened apartment door wide and gestured toward defendant, who was standing in the apartment; police entered and arrested defendant); *State v. Blair* (Mo. 1982), 638 S.W.2d 739 (consent given by woman's opening apartment door in response to police officer's knock, and, after officer asked if defendant were there, opening door wide and stepping back; officer then walked to back of apartment and arrested defendant).

This court has held that a warrantless arrest in the home is rendered valid when the police are given voluntary consent by a defendant or a third party who has

control over the premises. (Compare *People v. Bean* (1981), 84 Ill. 2d 64, 69-70 (defendant's mother expressly invited police to enter and they did not need to get consent to advance past threshold and enter another room), with *People v. White* (1987), 117 Ill. 2d 194, 221 (no consent when police pushed past man who opened front door without requesting his permission to enter).) But this court has not decided what standard the alleged consent has to meet or whether the consent needs to be unequivocal and specific. We now hold that, when a court is deciding whether consent was given (not whether that consent was voluntary), the circumstances must have been such that the police could have reasonably believed they had been given consent to enter. (*Cf. Illinois v. Rodriguez* (1990), 497 U.S. ___, 111 L. Ed. 2d 148, 110 S. Ct. 2793 (search of home valid if police given consent to enter by one they reasonably believed had authority to consent).) This test is consistent with the fourth amendment's proscription "against unreasonable searches and seizures." See 3 W. LaFave, Search & Seizure §8.1(b), at 156-59 (2d ed. 1987).

In the present case, we find that when defendant's mother said defendant was in the apartment and then stepped back from the open door and pointed toward defendant's bedroom, the police officers' belief that she was consenting to their entry into the apartment was a reasonable belief. Her conduct was a wordless invitation to enter, and faced with this conduct the officers need not have asked for permission to enter and received verbal confirmation. Furthermore, although a failure to object alone cannot be considered consent to enter (*People v. Santisteven* (Colo. App. 1984), 693 P.2d 1008), the trial court was justified in giving some weight to the absence of any objection by defendant's mother, for this was some evidence from which the officers could reasonably have inferred consent to enter. Although defendant's ar-

gument is limited to asserting that there was no consent, we also find that the consent was voluntary and extended to defendant's bedroom. (See *Bean*, 84 Ill. 2d at 70 (once invited into apartment, police could walk throughout it looking for defendant; they did not have to wait for defendant to confront them); see also *State v. Filiatreau* (1981), 274 Ark. 430, 625 S.W.2d 494.) Nor did the officers need to announce their intention to arrest defendant before entering through the open door. (See *Briley*, 726 F.2d at 1305; 3 W. LaFave, Search & Seizure §6.1(c), at 583 (2d ed. 1987) (fourth amendment merely requires consent to enter a home, not consent to enter in order to carry out a specified purpose).) For these reasons, we find that the trial court's ruling that the conduct of defendant's mother constituted consent was not clearly erroneous (see *White*, 117 Ill. 2d at 209).

## Evidentiary Issues

Defendant contends that errors made by the trial judge in admitting certain evidence require the reversal of his conviction and granting of a new trial. We disagree, for we find that, as to each of these evidentiary issues, no error was made.

Defendant believes that the admission of portions of Detective Tuider's and Assistant State's Attorney Murray's testimony deprived him of his sixth amendment rights to confront and cross-examine witnesses against him (U.S. Const., amend. VI). Defendant asserts that the prosecutor's questions, and the answers given by Tuider and Murray, were improper because they obliquely suggested that codefendant Alonzo Woodard and other codefendants had told the police that defendant was involved in the sexual assault, kidnapping, and murder of Boyd. Defendant believes that this line of questioning was comparable to admitting a codefendant's confession that directly implicates a defendant, which the Supreme Court

has held violates a defendant's sixth amendment rights (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620; *cf. Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702 (codefendant's statement with references to defendant redacted is admissible); see also *People v. Cruz* (1988), 121 Ill. 2d 321 (defendant's sixth amendment rights violated when police officers testified to statements made by one of two codefendants, even though the officers substituted the words "some friends" and "two other named individuals" for names of defendant and other codefendant, because circumstances of the trial created obvious implication that defendant was one of these "friends")).

Tuider's and Murray's testimony showed that, on July 17, Tuider interviewed defendant, who denied knowing anything about Boyd's murder. Murray then talked to Campbell, Croft, Alonzo Woodard, and two girls who had attended the party on the night of July 12-13, developing information about the murder. Murray then reinterviewed defendant. Murray testified that defendant initially told him that, although he had been at the party, nothing eventful occurred, and at some time he fell asleep and slept until the next morning. Murray told defendant "that what he told me was inconsistent with what other witnesses had told me." It is this statement that defendant finds prejudicial as suggesting that the "other witnesses," including his codefendants, had implicated defendant in these crimes.

The portion of Tuider's testimony that defendant highlights involved the issue of whether defendant became a "suspect" after the police talked to Alonzo Woodard. On redirect examination, Tuider and the prosecutor had this exchange:

"Q. Mr. Linn asked you some questions about Curtis Croft being the first suspect in this case, do you recall those questions, detective?

A. Yes, sir, I do.

Q. So it's clear for the ladies and gentlemen, when Curtis Croft was a suspect or the first suspect, as Mr. Linn characterized him, that was based on information that you or your brother officers had developed from Alonzo Woodard, is that correct?

A. Yes, sir.

Q. And would it be fair to characterize the status of the suspects in the case at that time as not only being Curtis Crawford or Curtis Croft, but also being Demetrius Henderson?"

At this point defense counsel objected, and, during a sidebar, argued that Tuider was telling the jury that Alonzo had incriminated defendant. The trial judge said that, though these questions violated "the spirit of the severance," they were in response to defense counsel's cross-examination of Tuider when Tuider had answered yes to the question whether Croft had been the "first suspect" in the murder of Boyd (the prosecutor had objected to this question and use of the word "suspect," and the trial judge had said he would "give [the prosecutor] an opportunity on re-direct"); the trial judge allowed the trial to proceed without expressly ruling on defense counsel's objection. The prosecutor never got an answer to his question whether defendant became a "suspect" after the police talked to Alonzo, but he did subsequently elicit testimony from Tuider that after the police talked to Alonzo they began looking for both Croft and defendant. In addition, the prosecutor asked one final question on this subject: Did all of this occur after the police talked to Alonzo?, but an objection to this question on unspecified grounds was sustained.

The State presents a number of grounds on which the prosecutor's questions and Tuider's and Murray's answers were proper. First, the question to Tuider about whether defendant became a "suspect" after the police talked to Alonzo was invited by defense counsel's cross-

examination of Tuider. (See, *e.g., People v. Piscotti* (1985), 136 Ill. App. 3d 420 (in closing argument, prosecutor could properly comment on defense theory of case that police fabricated evidence).) Second, the questions and answers allowably explained to the jury the steps taken by the police in investigating Boyd's murder. (See *People v. Johnson* (1987), 116 Ill. 2d 13, 24 (defendant's sixth amendment rights not violated when police officer testifies to steps taken in police investigation, even if narrating sequence of steps shows that police began looking for defendant after talking to codefendant, thus suggesting that codefendant implicated defendant; but defendant's rights are violated when officer testifies to content of codefendant's statements).) Third, by detailing the steps of the police investigation the prosecutor refuted the defense's insinuations throughout the trial that this investigation was hurriedly conducted and defendant's arrest and indictment were the result of sloppy and inadequate police work.

We find that defendant's sixth amendment rights were not violated by either the prosecutor's questions or the witnesses' answers. The situation that existed here was not at all similar to those in the cases defendant cites (see *Bruton,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620; *People v. Hernandez* (1988), 121 Ill. 2d 293; *People v. Cruz* (1988), 121 Ill. 2d 321; *Johnson,* 116 Ill. 2d 13). In each of those cases, the actual substance of a codefendant's statement implicating himself and the defendant was admitted at trial. In stark contrast, neither Tuider nor Murray recounted the content of the statements made by Alonzo Woodard. Tuider said only that after talking to Alonzo the police began looking for defendant. Murray said only that the other witnesses who had been interviewed had said something other than that nothing eventful happened that night until defendant fell asleep at Croft's house. The mere fact that one

of the many inferences which the jurors could have drawn from this testimony was that Alonzo told the police defendant had sexually assaulted and murdered Boyd does not mean that defendant was denied his sixth amendment rights when Alonzo did not testify at trial.

This court has held that testimony recounting the steps taken in a police investigation is admissible and does not violate the sixth amendment, even if a jury would conclude that the police began looking for a defendant as a result of what nontestifying witnesses told them, as long as the testimony does not gratuitously reveal the substance of their statements and so inform the jury that they told the police that the defendant was responsible for the crime. (See *Johnson*, 116 Ill. 2d at 24.) The testimony here merely related the conduct of the investigation; the fact that it appears that something Alonzo said caused the police to look for defendant does not mean that defendant had a right to cross-examine Alonzo—there was simply nothing to cross-examine him about, given that the content of his statement to the police was never disclosed at trial. Similarly, Murray's testifying that he told defendant that others had said something different from what defendant had told him, which prompted defendant to inquire into what Croft had said and, subsequently, to confess, left nothing about which defendant could cross-examine those others. In short, unlike the cases defendant has cited, here there was no testimony comparable to a codefendant's confession from which a jury could clearly discern that a codefendant had said defendant was guilty. Because no such conclusion could reasonably be drawn, and because the substance of the statements of Alonzo and others was never even hinted at, defendant had no constitutional right to confront or cross-examine them.

In fact, by comparing the testimony in this case to the testimony in *Johnson* defendant weakens his own ar-

gument. In *Johnson*, the substance of the codefendants' statements was explicitly made known to the jury when the prosecutor specifically asked a police officer multiple times whether both codefendants had said defendant was the "shooter." By contrast, the substance of Alonzo's statements never was revealed. Defendant seems to recognize this flaw, for he focuses on Tuider's acknowledgment, in response to the prosecutor's question, that defendant had at that time become a "suspect." Yet, this point does not change our conclusion because the substance of Alonzo's statement was still not revealed, unlike the situation in *Johnson* and the other cases cited, and because defense counsel, as noted above, invited this question.

Defendant also contends it was error for the prosecutor to say in his closing argument that the police talked to Alonzo and "he is kind of helping ***. He gives them certain information. He tells them about Croft and Henderson." While this isolated statement was improper because it suggested the content of Alonzo's statements to the police, the trial court sustained a defense objection to it and we cannot say that it substantially prejudiced defendant; we therefore find it was not reversible error. See *People v. Baptist* (1979), 76 Ill. 2d 19, 29.

Yet another error was made warranting reversal of his conviction, claims defendant, when his entire confession was admitted into evidence and read to the jury. After describing the sexual assault and murder in detail, defendant stated in his confession that he decided to murder another person, his mother's boyfriend:

> "A. I was going to take care of some more busines[s]. I was going to kill somebody else who did something wrong to my mother.
>
> * * *
>
> Q. Why did you go to 71st and Paulina?

A. Because I wanted some revenge to this person named Tracy Smith, who accidentally punched my mother in the mouth.

Q. Why did you go to do this at this time in the morning?

A. Because I felt bad about it, I had already done something dirty and said fuck it, I might as well finish it off."

But Smith had not been home. Defendant then told Croft to ditch the knife; Croft threw the knife into a garbage can. Afterwards, they drove to Croft's house and changed their clothes.

Before the confession was read, defense counsel moved for redaction of all statements regarding defendant's intention to kill Smith. The trial judge denied the motion, reasoning that it appeared that one defense theory would be that the confession was involuntary, the product of a police beating; this theory would be disproved by defendant's statement that he had intended to murder someone for reasons unrelated to Boyd's murder. When asked by the judge to reveal whether this theory would be raised, defense counsel refused to do so, arguing that the proper method would be to introduce the redacted confession during the prosecution's case; if the defense later raised this theory, the entire confession could then be introduced. The trial judge decided against using this procedure, admitting the entire confession into evidence during the prosecution's case. Later, after the defense had rested, the judge acknowledged that no evidence of the confession's involuntariness had been produced; still, the judge believed the portion of the confession quoted above was admissible "because it has to do with the defense theory that Mr. Henderson didn't commit the crime at all and it's probative of the issue as to how that would have arisen in the course of the statement being given if Mr. Henderson was not responsible

for the crime and was indicating things that related to this crime. Why would there be other things in there?''

Defendant cites decisions of this court holding that evidence that a defendant has committed crimes other than the crime for which he is being tried is inadmissible if irrelevant to any material issue, such as criminal intent or identification, for such evidence serves only to persuade a jury that the defendant has a propensity to commit crimes. (*E.g., People v. Lindgren* (1980), 79 Ill. 2d 129.) If a competent confession contains references to other crimes defendant has committed, those references have to be deleted before the confession is admitted into evidence unless the confession's evidentiary value would be seriously impaired. (*People v. Gregory* (1961), 22 Ill. 2d 601, 603-04; *People v. Oden* (1960), 20 Ill. 2d 470, 481.) Defendant argues that this portion of his confession lacked any probative value but was highly prejudicial, for after the jury learned that he was willing to kill a man who had accidentally punched his mother, it would have concluded he had a propensity to murder, and so been overpersuaded that he had killed Boyd.

We agree with defendant; these statements were irrelevant and should have been redacted from his confession. We reject the State's arguments that these statements were relevant because they showed how and where defendant disposed of the murder weapon (the murder weapon was never found and the defense suggested throughout trial that the police investigation was sloppy and hurried) and because in saying he "had already done something dirty" and he "might as well finish it off" defendant revealed a consciousness that he was guilty of Boyd's murder (see *People v. Bean* (1990), 137 Ill. 2d 65, 108-09 (defendant's threats to murder others admissible because were made as part of plan to evade arrest and so showed consciousness of guilt)). The State's first relevancy argument is refuted by the fact

that we were able to quote all of defendant's statements of intent to kill Smith without including his description of how the murder weapon was thrown away. As to the statements' relevancy to show consciousness of guilt, we first note the low probative value of defendant's statement that he "had already done something dirty," for, immediately before saying this, he had described in detail how he had sexually assaulted and murdered Boyd; we doubt the jury was any more convinced of defendant's guilt by hearing that, after murdering Boyd, he realized that what he had done was wrong. Furthermore, we have discovered that the confession could have been redacted in such a way as not only to include the statements showing consciousness of guilt while omitting the statements of defendant's intent to kill Smith, but also to avoid any awkwardness that would have indicated to the jury that the confession had been redacted (and thus possibly have caused the jury to doubt the confession's voluntariness).

Yet the trial court's error in admitting defendant's entire confession into evidence was not reversible error. At no other time during trial did the prosecutor again refer to defendant's intention to kill Smith or try to persuade the jury that defendant's desire to kill Smith increased the likelihood that he had murdered Boyd. These once-mentioned statements were also not significantly prejudicial in nature because defendant merely expressed an intent, never realized, to kill Smith, which is far less prejudicial than is an actual admission to another crime (see *Gregory*, 22 Ill. 2d at 604 (defendant's admission to other armed robberies would have persuaded jury he was hardened criminal)). And these statements, viewed within the context of defendant's entire confession, do not manifest his possession of a propensity to murder before he murdered Boyd; rather, it appears he formed an intent to kill Smith only after, and in part because, he

had murdered Boyd; thus, any propensity to murder was evidently created by his act of murdering Boyd. Finally, any prejudicial effect produced by these statements was overshadowed by the substantial evidence of defendant's guilt: his confession, corroborated by a police officer and assistant State's Attorney; Anthony Woodard's testimony describing the sexual assault and defendant's driving off with Boyd in the trunk of his car; and testimony by two others placing him and Boyd at the party on July 12-13. For these reasons, we conclude that the jury's verdict of guilty did not result from the error of admitting the confession unredacted. See *People v. Lindgren* (1980), 79 Ill. 2d 129, 140-41; *People v. Bailey* (1980), 88 Ill. App. 3d 416, 422 (harmless error to admit "other crimes" evidence where remaining evidence proved defendant's guilt beyond reasonable doubt).

Defendant also believes he was deprived of a fair trial by the prosecutor's evocation of inadmissible testimony indirectly disclosing that Anthony had made prior statements to the police consistent with his trial testimony. On direct examination, Anthony testified that the only reason his brother Alonzo and Campbell had sexually assaulted Boyd, and the only reason Anthony did not try to physically stop the assault or flee and get help, was that defendant and Croft had held knives on them. Defense counsel's cross-examination impeached Anthony's credibility by establishing that he wanted to help his brother, whom he loved, and Campbell, who was like a cousin to him (Alonzo and Campbell were also on trial for the sexual assault, kidnapping, and murder of Boyd). Then, on redirect, the prosecutor asked, "Anthony, did you tell the police officers that night essentially the same thing that [you're] telling the ladies and gentlemen of the jury?" to which Anthony answered, after defense counsel's objection was overruled, "Yes, something like that."

Evidence of a prior consistent statement is inadmissible hearsay unless it has been suggested that a witness recently fabricated testimony or has a motive to testify falsely and the prior statement was made before the motive arose. (*E.g., People v. Harris* (1988), 123 Ill. 2d 113, 139.) Defendant argues that in this case the exception to the rule that prior consistent statements are inadmissible does not apply, for while defense counsel's cross-examination suggested Anthony had a motive to lie—in order to exonerate his brother and Campbell by putting all the blame on defendant and Croft—at the time Anthony talked to the police on July 17 he would have had the same motive—he would have wanted to protect his brother and Campbell then, too.

Defendant is correct; there is no doubt that the prosecutor erred in asking a question formulated to elicit testimony from Anthony that he had made a prior consistent statement, and there is no doubt that the trial court erred in admitting this testimony. Anthony's motive to lie to protect his brother and Campbell would have existed when he talked to the police as well as when he testified—at neither time would he have wanted to implicate them. We note also that defense counsel suggested Anthony might have lied in order to protect himself from criminal prosecution; but this motive to lie would also have existed both on July 17 and at the time of trial.

As defendant recognizes, however, the fact that this was error is not enough because the error was waived when defendant failed to include it in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 187.) Defendant therefore urges us either to recognize it as plain error (107 Ill. 2d R. 615(a)) or to find that defense counsel's failure to include this issue in the post-trial motion constituted ineffective assistance of counsel, denying defendant his sixth amendment right to counsel (*Strick-*

*land v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504; U.S. Const., amend. VI). We decline to do so.

The plain error doctrine provides that a court of review may notice waived errors if either the evidence is closely balanced or "the error is so fundamental and of such magnitude that the accused was denied a fair trial" and remedying the error is "necessary to preserve the integrity of the judicial process." (*People v. Herrett* (1990), 137 Ill. 2d 195, 210.) As we have already stated, the evidence in this case was not closely balanced. Nor do we find that defendant was denied a fair trial as a result of this portion of Anthony's testimony.

The prejudicial nature of evidence of prior consistent statements is judged on a case-by-case basis. Admittedly, it is possible the jury saw Anthony as more credible because he said he had given the police the same account four days after the murder, and people are more apt to believe what is repeated. (See *People v. Smith* (1985), 139 Ill. App. 3d 21, 32.) But the prejudicial effect of this testimony was minimized by the fact that, unlike some cases relied upon by defendant where one witness corroborated another's testimony by testifying that the other made a prior consistent statement, here Anthony himself provided the evidence of his own prior consistent statement, and so his credibility was not truly enhanced; in other words, the jury would not have been inclined to attribute a great deal more credibility to Anthony's testimony because he had corroborated himself. (*Cf. People v. Emerson* (1983), 97 Ill. 2d 487, 499 (both police officer and witness testified that shortly after crime occurred witness identified defendants as perpetrators); *Smith*, 139 Ill. App. 3d at 31 (eyewitness to shooting testified defendant was perpetrator, and friend testified that shortly after shooting eyewitness told him the same).) Other circumstances also minimize the prejudiciality of

this testimony: The testimony was general, not specific, in that Anthony said he told the police "something like" what he had testified to; no portion of Anthony's statement to the police was admitted into evidence (*cf. Harris*, 123 Ill. 2d at 141 (witness' entire grand jury testimony introduced)); and at no other time during the trial was there a reference, general or specific, to what Anthony told the police.

Lastly, failing to include this claim in a post-trial motion is not the mark of ineffective counsel. This error was not so seriously prejudicial that no reasonably competent attorney, who was intimately familiar with the case after having conducted the defense at trial and having heard this testimony along with all other evidence at trial, would have failed to conclude that it resulted in defendant's being deprived of a fair trial and would have failed to include the error in a post-trial motion for a new trial. Nor is it reasonably probable that if this error had not occurred the jury would have had a reasonable doubt respecting defendant's guilt. See *Strickland*, 466 U.S. at 687-96, 80 L. Ed. 2d at 693-99, 104 S. Ct. at 2064-69 (establishing standards for reasonably effective assistance of counsel and when ineffectiveness warrants setting aside conviction).

Defendant claims that the trial court committed reversible error by refusing to give the "accomplice witness" instruction:

"When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 3.17).

According to defendant, although Anthony Woodard was not indicted, he could have been, because circum-

stantial evidence established probable cause to believe that he was guilty of an offense (defendant fails to specify which), at least as an accomplice and on the theory of accountability, and that he knew of the plan to kill Boyd. Therefore, defendant states, the giving of IPI Criminal 2d No. 3.17 was warranted. Here, and at the jury instructions conference, defendant points to Anthony's presence during the sexual assault without objecting or intervening (allegedly showing his acquiescence to it), and to his decision not to leave the company of the other men after the assault or even after hearing defendant say Boyd would have to be killed and seeing Boyd led blindfolded to defendant's car. Further, defendant surmises that Anthony would have aided in executing the plan to kill Boyd if defendant's car had not been lost in traffic. Also, Anthony did not volunteer information to the police about what happened that night until the police brought him in for questioning. As to Anthony's testimony that he stayed in the room solely because he was afraid of being stabbed if he tried to leave, and his denial of active involvement in the sexual assault and kidnapping, defendant says this testimony was not credible.

The trial court refused to give this instruction both because Anthony never said he was involved in any offense (the instruction reads, "When *a witness says* he was involved in *** a crime with the defendant" (emphasis added)) and because there was no evidence, from anyone including defendant, that Anthony participated in any illegal conduct. Defendant argues that the circumstantial evidence was such that Anthony's denials should have been disregarded and the instruction given. As defendant failed to raise this issue in his post-trial motion, we must decide not only whether the trial court erred when it refused the instruction, but also whether it was plain error to do so.

We find that the trial court correctly determined that Anthony was not an accomplice and so correctly rejected defendant's tender of IPI Criminal 2d No. 3.17. In the past, this court has clearly enunciated the test for determining whether a witness was an accomplice, entitling a defendant to an accomplice-witness instruction: If there is probable cause to believe he was guilty as a principal or as an accessory on the theory of accountability. (*People v. Cobb* (1983), 97 Ill. 2d 465, 476; *People v. Robinson* (1974), 59 Ill. 2d 184, 191.) An accomplice is not one who merely " 'has guilty knowledge or *** who was even an admitted participant in a related but distinct offense. To constitute one an accomplice he must take some part, perform some act or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime.' " (*Robinson*, 59 Ill. 2d at 191, quoting *People v. Hrdlicka* (1931), 344 Ill. 211, 222.) Yet,

" ' "[w]hile mere presence or negative acquiescence is not sufficient to constitute a person a principal to a crime, one may aid and abet, without actively participating in the overt act, and if the proof shows he was present at the crime without disapproving or opposing it, the trier of fact may competently consider this conduct in connection with other circumstances and thereby reach a conclusion that such person assented to the commission of the criminal act, *** thereby aiding and abetting the crime. [Citations.]" ' " (*Robinson*, 59 Ill. 2d at 191-92 (quoting *People v. Richardson* (1965), 32 Ill. 2d 472, 477, which quoted *People v. Clark* (1963), 30 Ill. 2d 67, 72).)

Also instructive is the statute specifying that one is legally accountable for another's criminal acts if, "before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).

Thus, an accomplice-witness instruction should be given to a jury if the totality of the evidence and the reasonable inferences that can be drawn from the evidence establish probable cause to believe not merely that the person was present and failed to disapprove of the crime, but that he participated in the planning or commission of the crime; if probable cause is established the instruction should be given despite the witness' protestations that he did not so participate. *Cobb*, 97 Ill. 2d at 476; *People v. Carreon* (1987), 162 Ill. App. 3d 990, 993.

Here the evidence simply does not establish probable cause that Anthony participated in the planning or commission of the sexual assault, kidnapping, or murder of Boyd, or that he aided and abetted these crimes by being present and implicitly approving them. The only evidence as to what happened that night is Anthony's testimony and defendant's confession. Anthony testified that during the assault he merely sat in a chair and did not harm Boyd in any way or encourage the others to harm her; in fact, he told defendant and Croft to stop. Defendant's statement confirms this; while it details the assault committed by the others, it does not state that Anthony took part. Nor was there evidence that Anthony knew ahead of time that defendant planned to assault Boyd; indeed, it appears defendant's decision to do so was spontaneous. And although Anthony and defendant said that Anthony was present during a portion of the kidnapping, when Boyd was blindfolded and led out to defendant's car, there was no evidence that Anthony saw her being put into the trunk. As for the murder, it is undisputed that Anthony was not present. Though Anthony testified he heard defendant say Boyd would have to be killed, he also testified that he and Alonzo offered to take Boyd home but defendant and Croft said they would and drove off; and when defendant's car passed the street where it should have turned to go to

Boyd's house, Alonzo honked his car horn but defendant's car continued on and Alonzo eventually lost it. Defendant's confession also counters Anthony's involvement in the murder, for while defendant said he talked to some of the others about killing Boyd, Anthony was not among them; nor did Anthony help blindfold Boyd and put her into the trunk. Also, defendant said he purposely eluded the second car so that Anthony, Alonzo, and Campbell would not be present when Boyd was murdered.

This evidence does not show that Anthony was an accomplice. If mere presence were enough he would be, but it is not. Even if we disbelieved Anthony's testimony that he told defendant and Croft to stop the assault, the evidence would merely show he was present without voicing disapproval. But to establish probable cause that someone was an accomplice there must be at least some evidence of other circumstances, other conduct, from which it can be inferred that the person approved of the offense and aided it by his mere presence. Here there was no such evidence.

Whether one was an accomplice depends entirely on the facts of the case. The present case is similar to *Robinson*, 59 Ill. 2d 184, which defendant has cited, in which this court held that a defendant was not entitled to an accomplice-witness instruction because his two companions were not accomplices. In *Robinson*, one man ordered a cab and when it arrived the defendant and another friend asked for a ride. During the ride the defendant pulled a gun and shot the cabdriver; the other two men did not try to prevent the shooting. Afterward, they all ran to the house of one of the two men; defendant left a short time later. Approximately two months later one of the two companions went to the police; he explained that he had waited so long to come forward because the defendant had threatened to kill whoever

told. This court held that the two men were not accomplices because there was no evidence that they knew about the defendant's plan to shoot and rob the cabdriver or that they did anything to assist the defendant. Thus, probable cause to believe in their guilt as either principals or accessories did not exist. This court so held despite the fact that the only testimony about what had happened and the two men's ignorance of defendant's plan and failure to assist him came from the two men themselves.

Similarly, in the present case, while defendant urges us to disbelieve Anthony's testimony that he did nothing to assist in the crimes committed against Boyd, the reality is that there is no evidence that he did anything creating probable cause to believe him guilty, and so there is no basis in the evidence to disbelieve his testimony. By contrast, in cases defendant cites which found probable cause existed to believe that a defendant's companion was an accomplice, it could be reasonably inferred from evidence of the companion's conduct that he or she knew of the plan to commit a crime and acted to aid in its commission. See *Cobb*, 97 Ill. 2d 465 (error not to give accomplice-witness instruction despite witness' denying that she knew defendants were going to commit armed robbery, where she had ridden with them in a car for hours, heard them talking about needing a few thousand dollars, obeyed their instructions to wait in car with motor running while they went into diner and, when they ran out of diner, to drive away, heard them say there had been less money than they had expected, and waited three weeks before informing police); *Carreon*, 162 Ill. App. 3d 990 (error to not give accomplice-witness instruction where: witness was with defendant while he played pool and cards and was told by defendant that he had lost all of his money to two men and to wait outside; when defendant got ride with same two men, witness

came along at defendant's request; after defendant shot men and car crashed, witness waited while defendant went through men's pockets; witness went with defendant to his shop and waited while defendant hid gun and tried to wash blood off money he had taken; and witness accepted $260 of bloodstained money from defendant, which witness had when arrested).

Defendant argues that yet another reversible error occurred when certain color photographs of Boyd's corpse were admitted into evidence and shown to the jury. Eight photographs taken at the crime scene show the body and the surrounding area, including tire tracks near the body, from various angles and distances. In addition, 10 photographs taken at the morgue show various parts of the body after it and the wounds had been cleaned, but before the autopsy had occurred.

At trial, defense counsel objected to the jury's seeing any photographs of the body. Respecting the crime scene photographs, defendant seems to concede that some were admissible, but argues that showing the jury two of the admitted photographs, which were taken nearer the body and so document its condition in greater detail, unduly prejudiced him, because, as well as being cumulative of the other crime scene photographs, they revealed more gruesome details. The trial judge explained, however, that because defendant denied murdering Boyd, and thus denied the accuracy of his confession describing the sexual assault and murder, photographs corroborative of his confession would be allowed to go to the jury. The record reveals that the trial judge admitted seven of the eight crime scene photographs because he thought that each was independently probative in confirming defendant's statement that he and Croft stabbed Boyd multiple times in this alley, picked her up and threw her to the side of the alley, and then ran over her with a car, as well as corroborating a police officer's testimony re-

garding the appearance of the crime scene and a forensic pathologist's testimony regarding the condition of the body, cause of death, and source of the various injuries.

Concerning the photographs taken at the morgue, defendant argues to us, and argued at trial, that the jury should not have been allowed to see any of them because the forensic pathologist who performed the autopsy testified to the character and location of each wound and used a diagram, which was admitted into evidence and allowed to go to the jury, depicting the human body and the location of each wound; the morgue photographs were thus cumulative of this testimony and diagram and so had little probative value, yet were highly inflammatory owing to their gruesome depiction of Boyd's body. The prosecutor argued that the photographs were probative in that they showed not only the location of the wounds, but also their nature and thus the force used to inflict them, characteristics not shown by the diagram. The trial judge allowed some morgue photographs to go to the jury, but excluded others as cumulative or too gruesome.

Whether or not a jury is allowed to see photographs of a decedent is a decision made by a trial judge in the exercise of his sound discretion. (*People v. Nicholls* (1969), 42 Ill. 2d 91.) If photographs are relevant to prove facts at issue, they are admissible and can be shown to the jury unless their nature is so prejudicial and so likely to inflame the jurors' passions that their probativeness is outweighed. (See *People v. Foster* (1979), 76 Ill. 2d 365, 377-78; *People v. Lefler* (1967), 38 Ill. 2d 216, 221.) Moreover, when a defendant in a murder trial pleads not guilty, the prosecution is allowed to prove every element of the crime charged and every relevant fact, even if the defendant offers to stipulate to those same facts. (*People v. Speck* (1968), 41 Ill. 2d 177, 201.) Among the valid reasons for admitting photo-

graphs of a decedent is to prove the nature and extent of injuries and the force needed to inflict them; the position, condition, and location of the body; the manner and cause of death; to corroborate a defendant's confession; and to aid in understanding the testimony of a pathologist or other witness. (See *People v. Owens* (1976), 65 Ill. 2d 83, 90; *Nicholls*, 42 Ill. 2d at 99; *Speck*, 41 Ill. 2d at 203; *People v. Kolep* (1963), 29 Ill. 2d 116, 124.) And while such photographs may be somewhat cumulative of the testimony of a witness, such as a police officer, who described the condition and location of the body, they may also aid jurors in understanding this testimony. See *Owens*, 65 Ill. 2d at 90 (pathologist used photographs to explain wounds); see also *People v. Myers* (1966), 35 Ill. 2d 311, 331 (not abuse of discretion to admit photographs even though police officer testified to body's appearance when found).

In the present case, all of the photographs were sufficiently probative, and minimally prejudicial, that we find the trial court did not abuse its discretion in allowing them to go to the jury. Without detailing what they showed, suffice it to say that the crime scene photographs, showing the general condition of the body and its position in relation to the surrounding area where it was found, were relevant in that they assisted the jurors in deciding whether the physical evidence was consistent with defendant's confession; on the other hand, only a few of the wounds were visible in these photographs and none were unduly cumulative. Concerning the photographs of the body taken at the morgue, they were relevant to show not just the location of the wounds, but also the character, depth, and extent of the various bruises and stab, incised, and other types of wounds. These photographs might have improved the jurors' comprehension of the pathologist's testimony, as well as corroborating the confession's description of how the vari-

ous wounds were inflicted. And while we find these photographs to have been relevant, we disagree with defendant's view that they were gruesome and grossly inflammatory; on the contrary, though distressing, they show clean wounds and are nearly as antiseptic and non-inflammatory as photographs of a victim of violent murder could be. *Cf. Lefler*, 38 Ill. 2d 216 (where there was little superficial evidence of fatal injuries on body of seven-month-old infant, court erred in allowing jury even to see color photographs of infant's chest cavity and brain area, taken during autopsy, which at trial were projected onto large screen); *People v. Jackson* (1956), 9 Ill. 2d 484 (where defendant did not deny stabbing decedent, court erred in admitting photograph of decedent's face showing part of sutured autoptic incision); *People v. Garlick* (1977), 46 Ill. App. 3d 216 (where defendant confessed killing but pleaded insanity as a defense, court erred in admitting photograph of decedent's massive head wound).

Defendant also contends that comments the prosecutor made during his closing and rebuttal arguments were so improper as to have denied him a fair trial. Defendant categorizes these comments as appeals for sympathy for Boyd and references to her family, and comments explaining why the prosecution had not presented certain scientific evidence.

Among the comments defendant criticizes are the following:

"There is something about this that rips at my gut. [Objection sustained.]

* * *

*** [H]ave you ever had the opportunity to sit with a loved one as they are laying in a hospital bed gasping for their last breath ***?

* * *

Imagine what was going through that young girl's

mind when she had to sit laying in that alley looking at the front of that car beating down on her at 35 miles an hour, being struck by the bumper, dragged on the pavement. She was still alive.

* * *

He talks about his rights. What about her rights? Did he ask Kim Boyd prior to taking a knife and plunging it in her head and in her neck, in her butt, in her legs, 'Do you want to talk to your mom before I kill you?' *** Did he have the compassion to say, 'Do you want to complete high school *** do you want to get married and have children and have a life with a family *** ?' "

Clearly these comments were improper and were attempts to inflame the jurors' emotions and engender feelings of sympathy for Boyd and her family, causing some prejudice to defendant. (See, e.g., People v. Hope (1990), 137 Ill. 2d 430, 491-92, 496-97.) Some also improperly expressed the prosecutor's feelings and invited the jurors to put themselves in Boyd's place. Yet these comments were not so improper as to warrant reversal of the convictions. The first comment quoted was properly dealt with when the trial court sustained a defense objection. As to the other comments, defendant failed to object to them at trial, and his post-trial motion refers to them in only general terms as remarks made by the prosecutor that cumulatively denied him a fair trial. Thus, defendant has waived any error in relation to them. (See People v. Pastorino (1982), 91 Ill. 2d 178, 192 (general objection does not preserve error); People v. Carlson (1980), 79 Ill. 2d 564 (to preserve error, defendant must object at trial and in post-trial motion).) Owing to this waiver, we will only notice the prosecutor's comments if they were so improper that their toleration constituted plain error (107 Ill. 2d R. 615(a)). This is not the case, for they did not cause substantial injustice to defendant (Pastorino, 91 Ill. 2d at 192); these comments did not effectively deprive defendant of a fair trial be-

cause the evidence of his guilt was substantial and was not closely balanced (see *Carlson*, 79 Ill. 2d at 576).

Moreover, even if defendant had not waived these errors we would find reversal to be unwarranted, for the standard of review applied to arguments by counsel is similar to the standard used in deciding if a plain error was made; attorneys are allowed some latitude in closing arguments, and comments constitute reversible error only when they engender substantial prejudice against a defendant (see, *e.g., People v. Tiller* (1982), 94 Ill. 2d 303, 321), such that it is impossible to say whether or not a verdict of guilt resulted from those comments. Here, the evidence of defendant's guilt was substantial enough that we conclude the jury would have returned a verdict of guilty even if the prosecutor had not made these comments. See *Hope*, 137 Ill. 2d at 496 (comments about effect of murder on victim's family, though not warranting reversal of conviction given overwhelming evidence of defendant's guilt, did warrant vacation of death sentence).

The other allegedly improper comments by the prosecutor dealt with the fact, noted by defense counsel in his closing argument, that the prosecution had not presented any evidence that the police had found fingerprints linking defendant to the murder. In rebuttal closing argument, this exchange occurred:

"[ASSISTANT STATE'S ATTORNEY]: Prints. Did he [Mr. Linn, defense attorney] bring anybody in here? Did you hear any evidence at all about how difficult it is to raise a print?

MR. LINN: Objection.

THE COURT: Overruled.

[ASSISTANT STATE'S ATTORNEY]: Did you hear any evidence, anybody get up on the stand and say, 'Hey, different surfaces leave different prints'? People don't usually leave prints. People who are sweating make certain or aren't able to leave prints.

Anything like that? Call somebody in like an expert?"

A defense objection to the last comments was sustained, but the jury was not instructed to disregard them. (Defendant also complains of the prosecutor's comments suggesting that the reason the prosecution did not introduce results of analyses of swabs taken from Boyd's body was that such analyses would have been useless because the body was not examined for more than a day after it was found; defendant waived this alleged error by not objecting to it at trial, and we find that these comments did not constitute plain error because this suggestion was vague, there was substantial evidence of defendant's guilt, and the trial court told the jury that closing arguments are not evidence.)

According to defendant, because no evidence at trial supported the prosecutor's proposed reasons for the prosecution's failure to introduce fingerprint evidence (it can be difficult to raise a fingerprint, and sometimes a person does not leave fingerprints), these comments were improper. In opposition, the State says these comments were fair response to two of the defense's arguments in closing: that the police should have looked for fingerprints at Croft's house and their failure to do so showed how they rushed to close this case of black boys killing a black girl as soon as defendant confessed; and that the jury should not convict defendant in the absence of physical evidence linking him to the murder.

Defendant is correct; the comments regarding reasons for the absence of fingerprint evidence were blatantly improper. However, the statement regarding defendant's failure to present a witness to testify to the process of raising a fingerprint was not error. (See *People v. Albanese* (1984), 104 Ill. 2d 504, 522; *People v. Williams* (1968), 40 Ill. 2d 522.) It is a fundamental principle of trial practice that an attorney's argument is to

be based on the evidence and reasonable inferences drawn from the evidence. (See *People v. Beier* (1963), 29 Ill. 2d 511, 517 (no evidence as to presence or absence of fingerprints on murder weapon, and prosecutor improperly argued that defendant had presence of mind to wipe off fingerprints whereas victim, who defendant contended had fired shots, could not have wiped gun because one shot paralyzed him); *United States ex rel. Shaw v. De Robertis* (7th Cir. 1985), 755 F.2d 1279 (defendant was denied fair trial by prosecutor's telling jurors they could not see police report because it was hearsay evidence, but if they could they would see truth, for comment insinuated that police report contained facts implicating defendant).) By the time an assistant State's Attorney, sworn to uphold justice for all of society, including a defendant, has reached the stage in his career when he is prosecuting a capital murder case this principle should have become deeply ingrained in his code of trial conduct. Indeed, we expect jurors to follow a judge's instruction, possibly given only once during trial, that what attorneys say during argument is not evidence and that their verdict should rest on their own understanding of the evidence. We cannot expect less of prosecutors than that they abide by such a fundamental principle. Here the assistant State's Attorney, by ignoring this principle, created a risk that the jurors would be misled and confused and, because he appeared to have knowledge of fingerprint evidence superior to their own, would consider as evidence the reasons he proposed to explain the lack of fingerprint evidence. Another effect of these comments, as damaging as suggesting reasons fingerprints may not have been found without presenting any evidence of the scientific soundness of these reasons or their application to this case, was their inherent implication that the police in fact looked for fingerprints but did not find any, conduct which was not proved.

Despite the prosecutor's misconduct in making these comments, we do not think they served to deny defendant a fair trial, either alone or in combination with the comments referring to Boyd's thoughts, rights, and family. The trial court sustained defense objections to comments that were improper. Also, the trial court instructed the jurors, prior to closing arguments and at the end of trial, that closing arguments are supposed to be confined to the evidence and the inferences that can reasonably be drawn from the evidence, and they should disregard statements not so based. These circumstances, along with the substantial evidence of defendant's guilt, lead us to conclude that these improper comments do not warrant reversal of defendant's convictions.

## Validity of Defendant's Other Sentences

Defendant's next claim of error relates solely to his aggravated kidnapping conviction. According to defendant, the trial court committed reversible error because the elements of aggravated kidnapping that were included in the instruction to the jury varied from the elements alleged in the indictment. Defendant was indicted for aggravated kidnapping under section 10—2(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(3)), which provides that a kidnapper is guilty of aggravated kidnapping when he "[i]nflicts great bodily harm or commits another felony upon his victim." The indictment charged defendant under the latter alternative, alleging that he had committed both the felony of murder and the felony of aggravated criminal sexual assault. The fatal error was made, says defendant, when the trial court, instead of instructing the jury on the felony alternative, instructed the jury that one who kidnaps another commits aggravated kidnapping if he "[i]nflicts great bodily harm upon the victim." As a result, defendant contends he was unconstitutionally convicted of an

offense different from the one for which he was indicted. (See *United States v. Miller* (1985), 471 U.S. 130, 85 L. Ed. 2d 99, 105 S. Ct. 1811; *Stirone v. United States* (1960), 361 U.S. 212, 4 L. Ed. 2d 252, 80 S. Ct. 270; U.S. Const., amend. V ("No person shall be held to answer for *** [an] infamous crime, unless on [an] *** indictment of a Grand Jury").) Defendant raises a claim under Federal constitutional law only. Because defendant's constitutional rights are at issue, we consider this argument despite his failure to object to the jury instruction (107 Ill. 2d R. 615(a)).

The leading cases upon which we must rest our decision are *Miller* and *Stirone*. In *Stirone*, the Supreme Court held that the defendant's substantial right to have a grand jury, a group of fellow citizens independent of a judge or prosecutor, enter charges against him was denied when the trial court effectively amended the indictment so as to allow the petit jury to consider whether the defendant violated the law under a theory different from the theory set forth in the indictment. The defendant had been indicted for unlawfully interfering with interstate commerce, specifically, interstate shipments of sand used to construct a steel mill. But at trial evidence was admitted concerning whether the defendant's conduct had also interfered with prospective interstate shipments of steel from that mill. More significantly, the trial court instructed the jury that it could convict defendant if it found his conduct interfered with interstate shipments of either sand, as he was charged, or steel. (*Stirone*, 361 U.S. at 213-15, 4 L. Ed. 2d at 254-56, 80 S. Ct. at 271-72.) The Court stated the rule that a defendant cannot be tried on charges different, or at least broader, than those set forth in an indictment, and found that this rule had been violated because the trial court had, in effect, amended the indictment by allowing the jury to consider an additional charge.

Yet, though the Court stated this rule in absolute terms ("[t]he right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment" (*Stirone*, 361 U.S. at 218-19, 4 L. Ed. 2d at 258, 80 S. Ct. at 274)), in laying out the reasons why the constructive amendment warranted reversal of the conviction, the Court suggested that such an amendment may not invariably warrant reversal. The Court's real concern in *Stirone* did not seem to be that the defendant was tried on a charge not in the indictment, but that he might have been convicted solely on that charge. And, significantly, the Court noted that it was unable to say whether the grand jury would have returned an indictment that included a charge of interference with interstate shipments of steel if such a charge had been presented to it. Therefore, reversal of the conviction seemed to be based not solely on the possibility that the jury convicted the defendant on a charge not set forth in the indictment, but also on the possibility that if this charge had been presented to the grand jury it would have been rejected. (*Stirone*, 361 U.S. at 219, 4 L. Ed. 2d at 258, 80 S. Ct. at 274.) In summary, *Stirone* established that a defendant's fifth amendment rights are violated when a trial court constructively amends an indictment by instructing a jury on a charge not included in the indictment, and thereby broadens the indictment; yet *Stirone* suggested that reversing a conviction is warranted only if the amendment caused prejudice to a defendant because it is not possible to tell, first, whether the conviction rested on the new charge and, second, whether the grand jury would have included the new charge in the indictment if it had been requested to consider it.

The kinds of changes a court can make in an indictment without their being considered impermissible

amendments were made clearer in *Miller*. The issue in *Miller* was whether a variance between the indictment, which charged three counts of mail fraud, and the proof at trial, which related to only two of the three counts, was significant enough to constitute a constructive amendment of the indictment. On appeal, the defendant, who was convicted on the two counts, argued that in presenting proof only as to two of three counts the State had tried him for a fraudulent scheme significantly narrower than the scheme charged by the grand jury. Trying him on the narrower charges, defendant argued, denied him his right to be tried only on charges entered by a grand jury. Fortifying his argument, defendant claimed that if the grand jury had been presented with the narrower fraudulent scheme, it might have been unwilling or unable to indict him. Unanimously rejecting these arguments, the Court held that a variance that merely narrows charges set forth in an indictment does not constitute an impermissible amendment because the defendant is still tried on charges included in the indictment.

Before reaching this conclusion, the Court reviewed both *Stirone* and *In re Bain* (1887), 121 U.S. 1, 30 L. Ed. 849, 7 S. Ct. 781, the case that first declared the rule that a trial court cannot alter the charging part of an indictment, even to narrow it, because it cannot be determined whether a grand jury would have returned an altered indictment. (*Miller*, 471 U.S. at 138-44, 85 L. Ed. 2d at 106-10, 105 S. Ct. at 1816-19.) The *Miller* Court distinguished *Stirone* by the fact that there the proof at trial and jury instructions had broadened the indictment by adding a charge, while in *Miller* the indictment had been narrowed by the lack of proof as to one of three charges. The *Miller* Court then explained that there had been two holdings in *Bain*, one specific and one general. The Court explicitly rejected *Bain*'s specific holding that "a narrowing of the indictment constitutes

an amendment that renders the indictment void." (*Miller*, 471 U.S. at 144, 85 L. Ed. 2d at 110, 105 S. Ct. at 1819.) But the Court reaffirmed "*Bain*'s more general proposition concerning the impermissibility of actual additions to the offenses alleged in an indictment." (*Miller*, 471 U.S. at 144, 85 L. Ed. 2d at 110, 105 S. Ct. at 1819.) In other words, an indictment is impermissibly amended only if it is so altered as to charge a different offense. *Miller*, 471 U.S. at 145, 85 L. Ed. 2d at 110, 105 S. Ct. at 1819.

Not *Stirone*, *Miller*, nor any other case we have found dealing with constructive amendments of indictments is factually similar to the present case, in which the indictment charged one alternative element of an offense and the jury instructions charged another, apparently by inadvertence. Nonetheless, guided by certain statements made in *Stirone* and *Miller*, we conclude that the trial court's error in instructing the jury did not amount to a constructive amendment of the indictment's aggravated kidnapping charge; defendant's fifth amendment rights were not violated. Although the trial court's instruction to the jury improperly changed an element of the offense of aggravated kidnapping, the effect was to narrow this charge, not to add a charge to the indictment: Whereas the indictment alleged the element of committing a felony (murder and aggravated criminal sexual assault), the jury instruction invoked the alternative element of doing great bodily harm to the victim; obviously, the conduct of doing great bodily harm to a person is inherent within, and narrower than, the conduct of murdering a person. Thus, by substituting a narrower alternative element for a broader element, the trial court improperly altered the indictment, but it did not impermissibly amend it, requiring reversal of defendant's aggravated kidnapping conviction. This situation is similar to a defendant's being convicted of a lesser in-

cluded offense, which is permissible. See *People v. Lewis* (1980), 83 Ill. 2d 296, 300.

Our conclusion is further supported by the lack of prejudice the erroneous instruction caused defendant. He was indicted for, prosecuted for, and convicted of the murder of Boyd. Because the same jury that convicted defendant of aggravated kidnapping also convicted him of murder, there is no doubt that, if the jury had been properly instructed that to find him guilty of aggravated kidnapping it had also to find that he had committed a murder, it still would have convicted him of aggravated kidnapping. Defendant does not, and cannot reasonably, argue that the erroneous instruction prejudiced his defense, for he knew he had to defend against a murder charge, and he did so by presenting an alibi, not by claiming that though he had done great bodily harm to Boyd he had not murdered her. In addition, the evidence the prosecution presented was not geared toward proving the narrower element of great bodily harm, but was sufficient to prove murder. Finally, we have no doubt that, if the jury had been presented with the charge that defendant committed aggravated kidnapping using the element of great bodily harm, it would have convicted him, for it found that sufficient evidence existed to support the element, as well as the separate felony, of murder. Therefore, we conclude, pursuant to the reasoning in *Stirone* and *Miller*, that although the trial judge erred by altering the charging terms of the indictment in the present case, because the alteration did not constitute an impermissible amendment of the indictment the trial judge did not commit reversible error, and defendant's aggravated kidnapping conviction is valid. See *United States v. Kuna* (7th Cir. 1985), 760 F.2d 813, 818 (constructive amendment occurs only when crime charged is " 'materially different or substantially altered at trial, [so that] it is impossible to know whether the grand jury

would have indicted for the crime actually proved' " or a " 'complex set of facts' " is presented at trial distinctly different from set of facts in indictment, quoting *United States v. Muelbl* (7th Cir. 1984), 739 F.2d 1175, 1180-81 (also rejects *per se* rule that all judicial amendments are reversible error)); see also *United States v. Thetford* (5th Cir. 1982), 676 F.2d 170 (instructing jury on theory of guilt not in indictment was harmless error because no evidence at trial supported theory and so defendant was not prejudiced); *United States v. Marolda* (9th Cir. 1980), 615 F.2d 867 (jury instruction on definition of offense, which failed to include two elements alleged in indictment, served to amend indictment, and did so in such a way as to warrant reversal of conviction, because those elements were not surplusage, grand jury might not have indicted defendant on narrower charge, and theory of the defense was prejudiced).

Defendant next claims that his conviction for aggravated criminal sexual assault has to be reversed because the language "force or threat of force" in the criminal sexual assault statute (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)(1)), and "bodily harm" in the aggravated criminal sexual assault statute (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(2)), is vague and overbroad, thus violating the constitutional guarantee of due process (U.S. Const., amend. XIV). Defendant acknowledges this court's rejection of these identical arguments in *People v. Haywood* (1987), 118 Ill. 2d 263, yet urges us to reconsider that holding. We will not.

While we will not reverse defendant's conviction for aggravated criminal sexual assault, we will reduce the extended-term sentence of 45 years' imprisonment he received. Aggravated criminal sexual assault is a Class X felony normally punishable by a sentence of from 6 to 30 years' imprisonment; however, if it is "the most serious offense of which the offender was convicted," an ex-

tended-term sentence may be imposed. (Ill. Rev. Stat. 1985, ch. 38, pars. 12—14(c), 1005—8—1(a)(3), 1005—8—2(a)(2).) But here murder was the most serious offense of which defendant was convicted. The sentencing judge therefore erred in imposing an extended-term sentence. Accordingly, we modify the sentence to 30 years' imprisonment. See *People v. Whitehead* (1987), 116 Ill. 2d 425, 466.

## Death Penalty Sentencing Hearing

Defendant's first challenge to the conduct of the death penalty sentencing hearing is that because the trial judge incorrectly explained the procedure used when a jury decides whether a death sentence should be imposed, he did not knowingly and intelligently waive his right to have a jury at the sentencing hearing. Although "[t]he right to a sentencing jury in a capital case is a statutory, not a constitutional, right" (*People v. Erickson* (1987), 117 Ill. 2d 271, 289), a defendant's waiver of this right has to be knowing and intelligent (*People v. Albanese* (1984), 104 Ill. 2d 504, 535). The error the trial judge made was to tell defendant that, regardless of whether he (the judge) or a jury sentenced defendant, he would make the initial decision on defendant's eligibility for the death penalty, instead of correctly telling defendant that, if defendant elected to have a jury sentence him, it would be the jury that would have to find, unanimously, that defendant was eligible for the death penalty (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(g)).

Defendant is correct that the trial judge misstated the law when he told defendant, before trial, that, if defendant chose to be sentenced by a jury, the following would occur:

"If you are found guilty there first has to be a hearing to determine whether or not you are eligible for the Death Penalty. There is [*sic*] a number of factors that en-

ter into that and it is a decision I make as the Judge. Assuming that you were eligible for the Death Penalty then there has to be a hearing by the same Jury who decided guilt or innocence as to whether or not that penalty is appropriate for you as an individual pertaining to this crime and the other factors that I'm sure you have gone over with your lawyer."

The trial judge further informed defendant he had a right to be sentenced by a jury; if he waived this right the jury would decide only his guilt or innocence and the judge would decide whether he should be sentenced to .death. In response to the judge's questions, defendant confirmed a number of times that, after talking with his attorney, he wished to waive his right to be sentenced by a jury; he also signed a written waiver.

Despite the trial judge's misstatement, we find defendant's waiver to have been knowing and intelligent. Defendant's attorney told the judge that he had previously discussed the issue of a sentencing jury with his client (and, just minutes before defendant voiced the waiver, he and his attorney again discussed it); he also told the judge that defendant had decided to waive a sentencing jury, and he affirmatively answered the judge's question, "[D]o you feel that your client understands sufficiently to make this decision with you?" We have previously held that a waiver of a sentencing jury is knowing and intelligent, even when a trial judge does not inform a defendant of all aspects of having a jury decide the sentence and is alleged to have misstated the law, if the record shows the defendant consulted with his attorney, the defendant said he understood the consequences of waiver, and the defendant's attorney said he thought the defendant's decision was made knowingly and intelligently. (*People v. Guest* (1986), 115 Ill. 2d 72, 107; *People v. Morgan* (1986), 112 Ill. 2d 111, 140-41.) Defendant argues that those cases are inapposite be-

cause they involved the effect of a judge's failure to inform a defendant that a jury's sentencing decision would have to be unanimous, not an affirmative misstatement of the law, as is involved here. In our opinion this distinction is irrelevant. The record shows that defendant made the waiver decision after talking with his attorney (there is no doubt in our minds that defendant's attorney was at least competent, and defendant does not claim his attorney misinformed him of the effect of a waiver) and before talking to the judge; so defendant's waiver decision was not based, even in part, on the judge's misstatement of law.

Additionally, defendant argues that his waiver was not knowing and intelligent because the trial judge did not tell him that a jury's decision to sentence him to death would have to be unanimous, but defendant has not presented any reasons warranting a reconsideration of our prior holdings that it is not error to fail to so inform a defendant. *E.g., Albanese*, 104 Ill. 2d 504.

Next, defendant earnestly argues that the trial judge wrongly judged the significance of evidence of defendant's "traumatic childhood and turbulent family history" and how "to a substantial extent, he is the involuntary product of an extremely violent and dysfunctional family environment," involuntary because he did not choose his relatives and his upbringing. At the sentencing hearing, defendant introduced the testimony of a social worker, Ms. Dinguss, and a psychosocial evaluation of defendant she had prepared. In brief, this evidence revealed: Defendant, an only child, was raised by his mother, his father having been shot and killed by his mother's uncle before defendant reached his first birthday; this same uncle was shot and killed by his own wife; defendant's grandfather committed suicide; defendant's mother was sexually promiscuous throughout his childhood, a situation he resented, and defendant had been abused by

men; his mother had also been molested to some degree by her father and uncle; defendant said his female cousins had molested him; as for defendant's past behavior, he had been involved in gangs, had hit women with his hands and hit the mother of one of his many children with a wrench, and had shot at a woman on a public street. Although defendant had never been physically abused, in Ms. Dinguss' opinion he had been emotionally abused by his mother's conduct and criticism of him, and had suffered some "psychological trauma" from his upbringing in a family situation that was, as a whole, "severely dysfunctional." Ms. Dinguss also stated that, owing to limited information, she was not able. to determine the extent of this psychological trauma; yet she concluded that defendant's violent impulses would escalate unless he received "long-term intensive psychotherapeutic intervention."

Before sentencing defendant, the trial judge stated those facts he had considered and the conclusions he had made about defendant's character as a whole and about defendant's demeanor and motivations on the night of July 12-13, 1986. At this time, the trial judge commented on the evidence defendant submitted about his upbringing and its effect on the type of person he was:

> "[T]here has been testimony from Miss Dinguss relative to the fact that she believes that it was inevitable in the Defendant's life that this act of outrageous violence would occur because of the Defendant's upbringing. A mitigating factor is not that it is inevitable that the Defendant act out his aggressions against people and society, the mitigating factor is that there is some way to rehabilitate and change that and make sure that it will never happen again.
>
> There has been no testimony to that, in fact to the contrary, the testimony has been that the Defendant acts out his violence towards women, the young, the unprotected, he acts out toward them because of the relation-

ship with the family. Whether that is true or whether it is not true it is not a mitigating factor to be determined that the Defendant can be released into society to perform good works, rather it shows me that *** based on the acts *** in this case, that the Defendant will act out his aggression violently and outrageously just as was done here."

Defendant argues that these remarks show that the trial judge did not understand that mitigating evidence can include evidence that a defendant was not fully culpable and responsible for his acts owing to his upbringing and does not encompass only evidence showing a defendant to be a good person who will do good works in the future. Because the evidence of his upbringing lessened his culpability for the horrendous crimes he committed, defendant contends the judge deprived him of a fair and reliable capital sentencing hearing under the eighth amendment (U.S. Const., amend. VIII) when the judge refused to see that this evidence was mitigating in any way, and instead considered it as aggravating solely, reasoning that it showed defendant had a violent nature and failed to show he could ever be rehabilitated so as not to pose a danger to society. As support, defendant contends that the Supreme Court has held that when a sentencer is deciding whether to sentence a defendant to death and is presented with evidence of the defendant's traumatic childhood, the sentencer has to consider it as mitigating. Defendant, not content merely to argue that this judge erred in finding evidence of his upbringing to be aggravating and not mitigating, further asserts that evidence of a defendant's traumatic childhood, during which he suffered emotional abuse, is comparable to evidence of mental illness and, thus, is inherently mitigating and can never be considered aggravating. Defendant believes "[i]f these conditions also make it likely that the defendant may act violently,

that is simply not his fault and can't be considered a reason to impose the death penalty upon him."

Despite defendant's attempts to find support for the rule he proposes, he fails to prove that the Court has ever held that a sentencer invariably has to give mitigating weight to evidence of a defendant's troubled childhood and can never assign it aggravating weight. It is true that, in general, " 'punishment should be directly related to the personal culpability of the criminal defendant.' " (*Thompson v. Oklahoma* (1988), 487 U.S. 815, 834, 101 L. Ed. 2d 702, 717, 108 S. Ct. 2687, 2698, quoting *California v. Brown* (1987), 479 U.S. 538, 545, 93 L. Ed. 2d 934, 942, 107 S. Ct. 837, 841.) But the Court's pronouncements about the significance of mitigating evidence introduced by a defendant have declared merely that, when such evidence is relevant, a sentencer can neither refuse to consider it (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869) nor be precluded from considering it (as occurs when a judge instructs a sentencing jury that it can consider only evidence satisfying a limited list of mitigating factors) (*Hitchcock v. Dugger* (1987), 481 U.S. 393, 95 L. Ed. 2d 347, 107 S. Ct. 1821). Defendant endeavors to persuade us that, because the Court has said a sentencer cannot refuse to consider relevant mitigating evidence presented by a defendant, it has held that a sentencer must give it some mitigating weight. We disagree with the conclusion. The Court has held only that when the sentencer is a judge, the sentencer cannot refuse to hear evidence introduced as mitigating, and cannot refuse to consider whether that evidence is in fact mitigating on the basis that the sentencing judge believes the evidence is barred by law from being considered as mitigating. This was the case in *Eddings*: The sentencing judge believed that he could not consider evidence of defendant's troubled youth, during which he had little parental su-

pervision and was severely beaten by his father, causing defendant to become emotionally disturbed, slightly retarded, and sociopathic, because it did not fall under any of the mitigating factors listed in the statute. The Court elucidated the sentencing judge's error: "[I]t is clear that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather he found that *as a matter of law* he was unable even to consider the evidence." (Emphasis in original.) *Eddings*, 455 U.S. at 113, 71 L. Ed. 2d at 10, 102 S. Ct. at 876.

Contrary to defendant's argument, the Court has indicated that evidence of an upbringing which has caused a defendant to become violent and aggressive can be considered in aggravation, for one duty a sentencer has is to predict a defendant's future behavior based on his past behavior. (*Skipper v. South Carolina* (1986), 476 U.S. 1, 5, 90 L. Ed. 2d 1, 7, 106 S. Ct. 1669, 1671.) In *Burger v. Kemp* (1987), 483 U.S. 776, 793-94, 97 L. Ed. 2d 638, 656-57, 107 S. Ct. 3114, 3125-26, the Court held that defense counsel had not acted ineffectively by failing to introduce evidence of the defendant's troubled background at the sentencing hearing; while the sentencing jury might have been sympathetic, it also might have thought the defendant was nonetheless responsible for the criminal conduct engendered by his violent nature and that his violent nature made him a danger to society—" ' "mitigation ***, after all, [m]ay be in the eye of the beholder [citations]." ' "

Defendant is also mistaken about the holding in *Penry v. Lynaugh* (1989), 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934. *Penry* did not hold that a sentencer has to consider evidence of a troubled childhood in mitigation because it always reduces a defendant's culpability, and that it is improper to consider such evidence's aggravating implication that a defendant may be dangerous in the future. In *Penry*, there was evidence

that the defendant was moderately retarded and unable to learn from his mistakes, and, as a child, had been beaten about the head by his mother. Although the trial judge admitted this evidence, the judge did not instruct the sentencing jury that it might be considered as mitigating. Rather, the jury was instructed that, before deciding whether to sentence the defendant to death, it had to answer three questions affirmatively, as required by the Texas death penalty statute; while no question asked about mitigation, in arriving at an affirmative answer to one question, whether the defendant would be a continuing threat to society, the jury might have actually assigned a negative value to the evidence of defendant's retardation and upbringing. The Court held that the trial judge had erred by failing to instruct the jury that, besides answering these three questions, it could give effect to any mitigating value possessed by the evidence of defendant's background. Even so, in characterizing this evidence the court recognized that "Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." (*Penry*, 492 U.S. at 308-09, 320, 324, 328, 106 L. Ed. 2d at 271-72, 279, 281-82, 284, 109 S. Ct. at 2941-42, 2947, 2949, 2952.) The Court did not state either that this evidence was inherently mitigating and the sentencer was required to consider it as such, or that it would be improper to consider this evidence in aggravation as it indicated the defendant had an unrehabilitable violent nature. Rather, the error was that the jury instructions allowed the jury to consider only one edge of this two-edged sword.

Analyzing the quoted comments of the trial judge in the present case, along with other comments he made before sentencing defendant, we conclude that the judge acted within his discretion in finding that the evidence of

defendant's family history was not such that it mitigated his conduct in raping and murdering Boyd. (See *People v. Christiansen* (1987), 116 Ill. 2d 96, 122 (supreme court will not lightly overturn trial court's findings made during aggravation and mitigation phase of death penalty hearing).) As a whole, the trial judge's comments reveal that he saw defendant as a young man who had coldly, and over the course of several hours, committed these horrendous acts, which were typical of his violent nature toward young women, and who could not be rehabilitated and so would remain a dangerous and violent person. The trial judge believed defendant deserved to be sentenced to death. The quoted comments do not show that the trial judge believed he was somehow precluded from viewing the evidence of defendant's background as mitigating; rather, the trial judge admitted this evidence, considered what it revealed about defendant, and concluded that it simply had no mitigating value but was actually aggravating. As we explained, the Court has never held that a sentencer is required to give mitigating weight to such evidence, and we find that the trial judge did not err in his evaluation of this evidence.

Nor do we find that our death penalty statute causes the death penalty to be imposed in an arbitrary and capricious manner because it gives the sentencer discretion to decide whether a factor such as a defendant's upbringing, which is not statutorily designated as aggravating or mitigating, militates for or against imposing death. Our procedure contains adequate guidelines to ensure that the penalty of death is imposed on only a narrow class of murderers while still allowing for consideration of an individual defendant and his criminal conduct. See *Proffitt v. Florida* (1976), 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960.

In addition to challenging the sentencing judge's assessment of the evidence of defendant's upbringing and

family environment, defendant challenges his trial counsel's failure to request the court to appoint a psychiatrist to further evaluate defendant. According to defendant, the information in the psychosocial evaluation prepared by Ms. Dinguss, who was only a social worker with a master's degree in social work and not a psychiatrist or psychologist, was such that his trial counsel should have sought a "full psychiatric workup"; by failing to do so his trial counsel was ineffective and deprived defendant of his sixth amendment right to effective counsel (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052).

As well as being based upon Ms. Dinguss' professional status, this claim is also based upon the statements in Ms. Dinguss' report that, while defendant's relationship with his mother seems to have been "the catalyst which escalated the defendant's anger toward women in general but specifically his mother," "a thorough psychiatric work-up would need to be conducted before any definitive statements could be made in this regard," and Ms. Dinguss found it "impossible to determine precisely with this limited amount of information" the extent of the "psychological trauma" defendant suffered as a result of his upbringing. Defendant's appellate counsel argued this claim of ineffective trial counsel to the trial judge, and also moved post-trial for the appointment of a psychiatrist; as support, counsel presented a letter from a psychiatrist expressing surprise that certain tests and investigations had not been performed before defendant was sentenced. But, in deciding whether trial counsel acted ineffectively in failing to request appointment of a psychiatrist, the only relevant information is that which was available to trial counsel; therefore, we look only at Ms. Dinguss' psychosocial evaluation and testimony, not the subsequent letter of a psychiatrist who was never qualified as an expert.

In *Strickland*, the Supreme Court stated that in analyzing a claim of ineffective assistance of counsel "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," a presumption that a defendant has to overcome. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) Further, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) In the present case, defendant's trial counsel acted reasonably and effectively in requesting a psychosocial evaluation from the social services department and relying on that report alone, because counsel was merely developing mitigating evidence of defendant's troubled upbringing and family life and their effect on his outlook and attitudes in order to provide at least a partial explanation for why he had committed these horrendous crimes; this report adequately documented defendant's upbringing and its possible effect on him given the inexactitude of psychiatry. Trial counsel was not attempting to establish that defendant suffered from mental illness or insanity at the time of the offense or the trial, or that defendant had some other legal excuse; and there was no evidence during the guilt-innocence or the sentencing phase of the trial that defendant had shown signs of mental illness or psychiatric instability at any time during his life. Given the parameters of counsel's objective in securing the social services report, it was completely reasonable that counsel did not seek appointment of a psychiatrist in order to "precisely" determine the extent of the "psychological trauma" defendant had suffered while growing up (assuming precision is attainable in the field of psychiatry).

The two cases cited by defendant to support his claim only confirm our conclusion. In *Ake v. Oklahoma* (1985),

470 U.S. 68, 84 L. Ed. 2d 53, 105 S. Ct. 1087, the Court held that an indigent defendant who shows that his sanity at the time of the offense is likely to be a significant issue at trial has a constitutional right to the assistance of a competent psychiatrist; psychiatric assistance is not constitutionally mandated in every case. Any significance *Ake* may have to the current issue, whether defense counsel is ineffective for failing to request appointment of a psychiatrist to further develop mitigating evidence of an indigent defendant's troubled upbringing, is clearly unfavorable to defendant's position for he makes no claim that he was mentally ill or insane at any time. Nor is defendant's argument strengthened by this court's decision in *People v. Stewart* (1984), 101 Ill. 2d 470. In *Stewart*, this court acknowledged that there are valid reasons for mental examinations in some cases, such as showing that a defendant acted under extreme mental disturbance, that there are mitigating aspects of a defendant's character or personality, and that a defendant has rehabilitative potential. But while these are "valid reasons to conduct a mental examination, there must be, in the discretion of the judge, some indication that evidence of these mitigating factors and rehabilitative potential might be present" before an examination will be ordered. (*Stewart*, 101 Ill. 2d at 490.) Because the defendant in *Stewart* had not put his mental condition in issue, and even his own witnesses had not indicated that he had ever had any mental problems, this court held that the trial court did not err in denying his request for a mental examination. As in *Stewart*, in our case defendant has not claimed or "presented any evidence to demonstrate that his mental condition was abnormal at any time" (*Stewart*, 101 Ill. 2d at 490).

In *Stewart*, we also distinguished two other cases relied upon by defendant here; in *People v. Gleckler* (1980), 82 Ill. 2d 145, a defense of compulsion was raised, and in

*People v. Carlson* (1980), 79 Ill. 2d 564, a defense of insanity was raised. In those cases psychiatric evidence had great value because the mental condition of the defendants was directly at issue. The value psychiatric evidence would have had in the present case is comparatively low: defendant never put his mental condition in issue and merely contends that if there had been an expert psychiatric examination, in addition to the social services evaluation, it might have produced additional mitigating evidence by developing a clearer picture of the effect his upbringing had on his character and his capacity to commit these crimes. We refuse to conclude that defendant's trial counsel was ineffective because he failed to request this additional examination at the sentencing stage of the trial when defendant's mental condition was not at issue and when we can only speculate that such an examination would have developed evidence of any mitigating value beyond that which had already been developed in Ms. Dinguss' report, much less of such significant value as to have affected the judge's sentencing decision.

## Remaining Issues

Defendant asks us to spare his life. Defendant believes that justice will be served if he is given a lengthy prison sentence. He firmly believes that a death sentence for his crimes is excessive in view of his youth, his upbringing (which he describes as "extremely violent and sexually perverted"), and his one-time expression to a minister of regret for what he had done, an expression made after he had been found guilty, which in the minister's opinion was a true expression of remorse on defendant's part. Yet Ms. Dinguss, the social worker who evaluated defendant, said that he had expressed no remorse to her, and the trial judge found defendant was not remorseful. We have considered the atrocious of-

fenses defendant committed, the circumstances and reasons for those offenses, and all the evidence produced in mitigation and aggravation; without detailing all of that evidence here, we conclude that the death sentence imposed on defendant is appropriate and is not excessive, and we will not vacate it on these grounds.

Finally, defendant raises four grounds upon which he believes the Illinois death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) violates the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV). On numerous occasions we have rejected the same arguments, and defendant has failed to persuade us that we should do otherwise in this case. Although the statute places a burden of persuasion on a defendant to show the sentencer that a death sentence should not be imposed, this burden of persuasion is not unconstitutional. (*People v. Bean* (1990), 137 Ill. 2d 65, 138; *People v. Whitehead* (1987), 116 Ill. 2d 425.) The statute is not unconstitutional because it fails to impose on the prosecution a burden of proving beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the imposition of a death sentence. (*E.g., People v. Free* (1983), 94 Ill. 2d 378.) The statute is not unconstitutional because various aspects of it which defendant cites, and which individually have been found to be constitutional, in combination result in the arbitrary and capricious imposition of the death penalty. (*Bean*, 137 Ill. 2d at 141.) The statute is not unconstitutional because it gives prosecutors unguided discretion to decide both whether to prosecute a capital charge and to decide, after a conviction, whether to seek the death penalty. (*E.g., People v. Terrell* (1989), 132 Ill. 2d 178.) As to all four of these constitutional challenges to the statute, see *Bean*, 137 Ill. 2d at 137-41, where the defendant presented virtually identical arguments and where we more fully explained our reasons for rejecting these arguments.

# CONCLUSION

For the reasons set forth above, we affirm defendant's convictions and sentences of death and imprisonment, except that we modify his sentence of imprisonment for aggravated criminal sexual assault, reducing it to a term of 30 years. We direct the clerk of this court to enter an order setting Wednesday, January 16, 1991, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. Defendant is to be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). The clerk of this court is to send a certified copy of this mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is confined.

*Judgment affirmed, as modified.*

JUSTICE CLARK, dissenting:

Because I believe the numerous errors committed at defendant's trial unconstitutionally deprived him of his right to due process, I respectfully dissent from the majority's decision to affirm defendant's conviction. Even if I were to agree that these errors did not deprive defendant of his right to a fair trial, because I believe defendant did not knowingly and intelligently waive his right to a jury during sentencing, and because the trial court may have failed to consider defendant's evidence of mitigating circumstances, I would vacate the death sentence and remand for a new sentencing hearing.

Initially I note that the majority relies on this court's opinion in *People v. Bean* (1990), 137 Ill. 2d 65, 78-79, for its finding that defendant's rights were not violated by his absence while the judge questioned two sworn and one prospective juror. (142 Ill. 2d at 291-92.) While I dis-

sented in *Bean* I recognize that it is now the law in Illinois, and is properly applied in this case. I also note that the defendant in *Bean* was absent during the questioning of a prospective juror who was dismissed through the use of a peremptory challenge. In this case, all the jurors questioned outside the presence of the defendant were dismissed for cause. Thus defendant's presence during the questioning would not have affected the court's decision to dismiss the jurors.

As the majority recognizes, numerous evidentiary errors were made at defendant's trial. For example, the majority finds that certain statements relating to defendant's intent to commit an unrelated crime should have been redacted from defendant's confession before it was read to the jury (142 Ill. 2d at 305-09); that the State improperly asked questions formulated to elicit testimony of a prior consistent statement from one of the State's key witnesses (142 Ill. 2d at 309-13); that the prosecutor made numerous improper statements in his closing argument intended to "inflame the jurors' emotions and engender feelings of sympathy for [the victim] and her family, causing some prejudice to defendant" (142 Ill. 2d at 322); and that the prosecutor made improper statements regarding the absence of fingerprint evidence which would tie defendant to the crime (142 Ill. 2d at 323-24).

In considering each of these errors individually, the majority concludes that none of them warrant reversal. The majority's basis for this conclusion is that some of the errors made at trial were waived by defendant's failure to raise them in his post-trial motion, and others were harmless due to the overwhelming evidence of defendant's guilt. I agree that when considered individually, none of the errors warrant reversal. However, I believe that the cumulative effect of these errors has de-

prived defendant of his constitutional right to a fair trial.

This court has frequently reversed convictions and sentences where there were errors which cumulatively served to deprive the defendant of due process. (See, e.g., *People v. Walker* (1982), 91 Ill. 2d 502, 516-17; *People v. Whitlow* (1982), 89 Ill. 2d 322, 341-42; *People v. Romero* (1967), 36 Ill. 2d 315, 319-20.) Because I believe that the cumulative effect of the numerous errors cited above have deprived defendant of a fair trial, I would reverse defendant's conviction.

Even if the numerous errors committed at trial did not deprive defendant of his constitutional right to a fair trial, I believe that his death sentence must be vacated because defendant did not make a knowing and intelligent waiver of his right to a jury for his sentencing. As the majority notes, prior to trial, the trial judge misstated the law regarding who would determine defendant's eligibility for the death penalty. (142 Ill. 2d at 333-35.) Specifically the trial judge stated, "If you are found guilty there first has to be a hearing to determine whether or not you are eligible for the Death Penalty. *There is [sic] a number of factors that enter into that and it is a decision I make as the Judge.*" (Emphasis added.) 142 Ill. 2d at 333-34.

Despite this misstatement, the majority finds that defendant's jury waiver was made knowingly and intelligently. The majority relies on this court's opinions in *People v. Guest* (1986), 115 Ill. 2d 72, and *People v. Morgan* (1986), 112 Ill. 2d 111, which state that a jury waiver is not invalid merely because the trial judge did not inform the defendant that a jury's sentencing decision must be unanimous. (142 Ill. 2d at 334-35. See also *People v. Albanese* (1984), 104 Ill. 2d 504, 535-36 (where this court held that the Constitution does not require that the trial court inform the defendant of the unanim-

ity requirement).) The cases cited by the majority stand for the proposition that a trial court's failure to inform the defendant of the need for juror unanimity, which is not a constitutional requirement, can be overcome by a showing that the defendant consulted with his attorney, that the defendant said he understands the consequences of waiving the jury, and that defendant's attorney said he believes the defendant's waiver was made knowingly and intelligently. (142 Ill. 2d at 334-35.) Because the majority finds these factors to exist in the present case, it concludes that defendant's jury waiver was made knowingly and intelligently. 142 Ill. 2d at 334-35.

The majority's reliance on *Guest* and *Morgan* is misplaced. This court has previously held "the sixth amendment requires no precise formula for determining whether a waiver has been knowingly and intelligently made. Each case will turn on its own facts and circumstances." (*People v. Albanese* (1984), 104 Ill. 2d 504, 535-36.) The test applied by the majority has, until now, only been applied to a court's failure to inform a defendant of the need for unanimity among jurors. Clearly there is a difference, which the majority ignores, between an omission of information not required under the Constitution (*i.e.*, the unanimity requirement) and inclusion of information which might mislead the defendant (*i.e.*, who will decide defendant's eligibility for the death penalty). Nonetheless, in its holding the majority implies that any time the factors enumerated in *Guest* and *Morgan* are present, a defendant's jury waiver will be valid, even when the judge misstates the law. The majority thereby creates a standard test to determine if a defendant's jury waiver was made knowingly and intelligently. Such a holding comes dangerously close to prescribing an impermissible formula for a knowing and intelligent jury waiver.

Reviewing the facts of the instant case, I cannot agree with the majority's conclusion that the judge's misstatement of the law played no part in defendant's decision to waive his right to a jury at the sentencing hearing. (142 Ill. 2d at 335.) The majority points to nothing in the record which indicates the judge cured this error, nor does the majority consider the fact that defendant's attorney consultations occurred *after* the trial judge made the misstatements of the law. It is certainly plausible that during consultations with his attorney, defendant still harbored a misunderstanding of the law which was brought about by the judge's error. Because it is impossible for me to conclude that the judge's misstatement played no role in defendant's decision to waive his right to a jury, I would hold the jury waiver invalid.

In addition to the invalid jury waiver, I believe the trial court may have misunderstood the law regarding mitigation evidence which defendant presented during the sentencing hearing. Ms. Dinguss, a social worker who prepared a psychosocial evaluation of defendant, testified about defendant's traumatic childhood. As the majority noted, this testimony showed:

> "Defendant, an only child, was raised by his mother, his father having been shot and killed by his mother's uncle before defendant reached his first birthday; this same uncle was shot and killed by his own wife; defendant's grandfather committed suicide; defendant's mother was sexually promiscuous throughout his childhood, a situation he resented, and defendant had been abused by men; his mother had also been molested to some degree by her father and uncle; defendant said his female cousins had molested him ***." (142 Ill. 2d at 335-36.)

Based on these factors, Ms. Dinguss concluded that defendant was "severely dysfunctional" and would continue to have violent impulses "unless he received 'long-

term intensive psychotherapeutic intervention.' " 142 Ill. 2d at 336.

Before he imposed the death penalty, the trial judge referred to Ms. Dinguss' testimony and stated:

"[T]here has been testimony from Miss Dinguss relative to the fact that she believes that it was inevitable in the Defendant's life that this act of outrageous violence would occur because of the Defendant's upbringing. *A mitigating factor is not that it is inevitable that the Defendant act out his aggressions against people and society, the mitigating factor is that there is some way to rehabilitate and change that and make sure that it will never happen again.*" (Emphasis added.) (142 Ill. 2d at 336.)

I believe the transcript shows the judge may have misunderstood the nature of mitigation evidence. From the above quote, it appears that the judge may have believed that, as a matter of law, evidence of defendant's upbringing could only be a mitigating factor if this evidence shows defendant is capable of rehabilitation. However, there is no such limitation on the type of mitigation evidence which the sentencing court must consider before imposing a death sentence.

The United States Supreme Court has held that in capital cases "the eighth amendment requires that a defendant's punishment be proportional to his personal culpability and blameworthiness." (*People v. Hayes* (1990), 139 Ill. 2d 89, 150, citing *Tison v. Arizona* (1987), 481 U.S. 137, 149, 95 L. Ed. 2d 127, 139, 107 S. Ct. 1676, 1683.) The sentencing body must be permitted to consider any relevant mitigating evidence regarding the defendant's character or background, and the circumstances of the particular case. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869.) While the United States Constitution does not dictate the amount of weight the sentencing judge must give

to the evidence of mitigation, it does require that all mitigating circumstances be considered before a death sentence is imposed.

In Illinois, "there is no limit on the type or number of mitigating factors [a defendant] can offer." (*People v. Guest* (1986), 115 Ill. 2d 72, 106.) Thus, while rehabilitation is a factor which may be considered, it is not a necessary component for mitigation evidence. Although the trial court is not precluded from imposing a death sentence where mitigating evidence has been introduced, it may do so only after considering all possible mitigating factors. In this case, it is unclear whether the trial court considered defendant's mitigation evidence, but attached little weight to that evidence, or whether the court failed to consider the evidence as a mitigating circumstance due to the lack of potential for rehabilitation. Therefore, I would vacate defendant's death sentence, and remand for a new sentencing hearing.

JUSTICE CALVO joins in this dissent.